**DLH, INC., Petitioner, Appellant,**

v.

**David A. RUSS, Mark Cohn,
et al., Respondents.**

No. C2–95–1218.

Supreme Court of Minnesota.

June 19, 1997.

Rehearing Denied Aug. 5, 1997.

Jerry W. Snider, Gordon B. Conn, Jr., Charles F. Webber, Faegre & Benson, L.L.P., Minneapolis, for appellant.

Mark Cohn and Damark International, Timothy D. Kelly, Wendy A. Snyder, Kelly & Berens, P.A., David A. Russ, David R. Marshall, Terri A. Georgen, Fredrikson & Byron, P.A., Minneapolis, for respondent.

Heard, considered, and decided by the court en banc.

## OPINION

ANDERSON, Justice.

This appeal arises from a dispute over title to 1.54 million shares of common stock of Damark International, Inc. (Damark). Appellant DLH, Inc. (DLH) contends that it is entitled to legal ownership of the stock because it purchased the stock from the bankruptcy estate of respondent David Russ. David Russ maintains that he did not own Damark stock when he filed for bankruptcy in 1987, and, further, that at that time Damark stock had only nominal value. Seven years after David Russ filed for bankruptcy, DLH purchased from the bankruptcy estate whatever interest, if any, the estate had in Damark. DLH then brought a conversion action against David Russ, respondent Mark Cohn, and respondent Damark, alleging that David Russ did own 400 shares of Damark at the time he filed for bankruptcy and had concealed such interest. DLH asserted that it was the rightful owner of the Damark shares, which after two stock splits totalled 1.54 million shares. Alternatively, DLH asserted that it was entitled to $46,200,000, which DLH claimed was the present value of the 1.54 million shares.

David Russ, Cohn, and Damark moved for summary judgment. The district court granted the motions on the grounds that DLH had no cause of action for conversion, and, even if DLH had a cause of action, the statute of limitations on the action had expired. DLH moved to amend or vacate the court's order, but the court denied the motion. DLH then appealed to the court of appeals, which affirmed. We affirm.

A summary of the complex background of this case is necessary for a proper understanding of the legal issues to be addressed on appeal. In the early 1980s, respondent David Russ, together with Kirk Westergard, formed a partnership known as Ruwest. The partnership was involved in real estate. David Russ stated that Ruwest was struggling financially, and that on June 1, 1985, the Ruwest partnership was dissolved and the partnership assets were transferred to and the debts assumed by Diane Russ, David Russ' wife. Diane Russ continued to use the Ruwest name, but operated the business as a sole proprietorship. David Russ stated that, after June 1985, his only role in Ruwest was to assist his wife in understanding the business and helping her collect payments or negotiate with the holders of contracts for deed. He stated that he had no control over the individual properties owned by Ruwest.

In April 1985, David Russ formed and became president of International Rubber Supply, Inc. (International Rubber). Mark Cohn was a consultant for International Rubber. International Rubber subsequently experienced financial difficulties and ceased operations in April 1986. David Russ had personally guaranteed approximately $300,000 of International Rubber's obligations.

In 1986, David Russ also worked with Cohn to form Damark, which they intended to be a wholesale distributor of close-out merchandise. The name Damark was derived from a combination of David Russ and Mark Cohn's first names. Damark was incorporated on March 20, 1986. At that time, Cohn became chief executive officer of Damark and was its sole officer and director. Cohn was also Damark's sole shareholder. On June 13, 1986, David Russ signed a two-year employment agreement to act as Damark's sales manager beginning June 13, 1986 and ending June 12, 1988. David Russ subsequently stated in an affidavit that he was not interested in becoming an owner of Damark because he did not want to take on ownership responsibilities. However, Diane Russ' business, Ruwest, did become an owner of Damark.

On June 13, 1986, the same day that David Russ signed his employment agreement with Damark, David and Diane Russ opened a joint checking account in the name of "Russ, Diane M or David A, BBA Ruwest." David Russ' social security number was used as the tax identification number for the account. Also on June 13, 1986, David Russ, Ruwest, Cohn, and an investment company called Central Investment Corporation (Central) entered into a Memorandum of Intent by which Central agreed to purchase 20% of the outstanding shares of Damark for $25,200 and to secure a line of credit for Damark. The parties contemplated that after the transaction, Ruwest and Cohn would each be 40% stockholders of Damark, and that the principals of Central would own 20% of the stock. Accordingly, a stock certificate was issued to Ruwest on June 13, 1986 for 400 shares of Damark. Three days later, a Certificate of Assumed Name for "Ruwest Company" was filed by Diane Russ. On June 17, 1986, Diane Russ signed a $400 check to Damark from Ruwest for "stock—RuWest."

In the fall of 1986, Damark became involved in direct mail catalog sales. David Russ became an officer of Damark in December 1986. Cohn stated that David Russ also became a director of Damark in 1986.

On December 15, 1986, Damark, Ruwest, and an investor named Ronald Wade entered into a Stock Purchase and Revolving Loan Agreement under which Wade agreed to purchase the 20% of the Damark stock owned by the principals of Central and an additional 10% of the Damark stock. Wade also agreed to provide a line of credit to Damark. Wade stated that he was told that Ruwest was a sole proprietorship consisting of Diane Russ and that the ownership of Ruwest was transferred to Diane Russ to protect its assets from lawsuits against David Russ related to International Rubber. The Damark stock register reflects that on December 15, 1986, 400 shares of Damark stock were held by Cohn, 400 shares were held in the name of Ruwest, and 342 shares were held by Wade. In her capacity as "owner" of Ruwest, Diane

Russ signed an agreement with Cohn and Wade dated December 15, 1986 to make provision for the disposition of any shareholder's stock in the event of the shareholder's death, disability, or termination of employment. The agreement recited that:

> The representative of Shareholder Ruwest Company in the management of the Corporation is David A. Russ. References to death, disability or termination of employment of a Shareholder in this Agreement and with respect to the shares owned by Ruwest Company shall mean the death, disability or termination of employment of David A. Russ.

After the transactions on December 15, 1986, Wade owned 30% of the Damark stock, Cohn owned 35%, and Ruwest owned 35%. However, when Wade prepared Damark's 1986 tax returns, he listed "Dave Russ," rather than Ruwest, as a 35% shareholder of Damark. A Schedule K–1 attached to Damark's 1987 U.S. Income Tax Return for an S Corporation—Form 1120S—prepared by a paid tax preparer in October 1989 for the period beginning January 1, 1987 and ending April 30, 1987 also lists David Russ as a Damark stockholder. The Schedule K–1 indicates that David Russ was a 33 1/3% owner of Damark and the holder of 333 shares.[1] But on Damark's application to elect S Corporation status, Ruwest is listed as owning 400 shares of Damark. Cohn stated that the preparers of the Schedule K–1 may have incorrectly assumed that David Russ owned the stock because Damark first employed them in mid–1988 and 1989 when David Russ was, in fact, a record shareholder.

In 1986, Damark lost $47,121 on sales of $1,330,777. During the period between January 1, 1987 and April 30, 1987, Damark lost $111,803 on sales of $774,034. In about March 1987, Wade developed an "exit strategy" to leave Damark. In his view, the company had never made any money and he saw no prospects of it doing so. Wade stated that his "exit strategy" was a calculated proposal to limit his loss to $120,000. On March 13, 1987, Wade entered into an Option

---

1. Schedule M–KS of Damark's 1987 Minnesota S Corporation Return covering the period between January 1, 1987 and April 30, 1987 also lists David Russ as a 33 1/3% shareholder. This return was also prepared in October 1989.

Agreement with David Russ, Ruwest, and Cohn under which he agreed to sell all of his Damark stock to Damark for the aggregate sum of $1. Concerned about his securities pledged as collateral to the bank, Wade also agreed to pay $50,000 to the bank in exchange for an unsecured promissory note from Damark and release from his guarantee of Damark's liabilities to the bank.

On April 14, 1987, Damark, Ruwest, Wade, and Cohn entered into a Redemption Agreement which provided for the purchase of all of Wade's shares. Simultaneously, Ruwest and Cohn entered into a Stock Purchase and Loan Agreement with a different investor, KMS, Inc. (KMS), under which KMS agreed to purchase Damark stock for $15,000 and to provide financing to Damark. The agreement was signed by Diane Russ as owner of Ruwest. Pursuant to the agreement, KMS purchased 833 new shares from Damark, a 51% interest, and Ruwest and Cohn each retained their 400 shares.

Schedule E of Damark's 1987 U.S. Corporation Income Tax Return—Form 1120—signed on April 4, 1988 by Cohn as president, indicates that David Russ and Cohn were each officers of Damark and each owned 25% of the Damark stock. This return does not list the name of a paid preparer. Because the preparer did not fill in the blanks for the dates the tax year began or ended, presumably the return was meant to cover the entire calendar year of 1987.

Meanwhile, the Ruwest joint checking account opened by David and Diane Russ was closed on January 28, 1987. On April 30, 1987, Diane Russ, as "proprietor" of Ruwest, signed an agreement to transfer Ruwest's 400 shares of Damark stock to Cohn for $1,000. Cohn testified that Diane Russ told him that she initiated the sale because "[s]he needed the money." On the back of Ruwest's stock certificate is written the following:

> For Value Received I hereby sell, assign and transfer unto Mark A. Cohn 400/all Shares represented by the within Certificate, and do hereby irrevocably constitute

and appoint Steven Timmer Attorney to transfer the said shares on the Books of the within named Corporation with full power of substitution in the premises. Dated April 30, 1987.

The stock certificate indicates that the above statement was signed by Diane Russ in the presence of David Russ. Schedule D—Capital Gains and Losses—attached to David and Diane Russ' 1987 joint individual tax return reflects that Damark stock, which was acquired on March 1, 1986 for $1,900, was sold on April 30, 1987 for $1,000, thus representing a $900 loss.[2]

Cohn stated in an affidavit that he took possession of Ruwest's endorsed stock certificate and delivered it to Steven Timmer, Damark's corporate attorney and assistant secretary, whom Cohn had appointed as custodian of his Damark shares. Timmer stated in an affidavit that the agreement to transfer Ruwest's stock and the endorsed stock certificate were delivered to him "within a few days of April 30, 1987." Upon receipt of these documents, Timmer understood that he was to record the transfer in Damark's stock register and to issue a new stock certificate to Cohn. The Damark stock register reflects that a new certificate for 400 shares of Damark stock "From Ruwest to Mark A. Cohn per agreement dated 4/30/87" was issued on July 10, 1987.

David Russ filed a petition for bankruptcy under Chapter 7 of Title 11, United States Code on July 10, 1987. According to the Damark stock register and certificate, this is the same day that Timmer or his law partner issued a new certificate for the Damark stock that Ruwest agreed to "sell, assign and transfer" to Cohn on "April 30, 1987." The bankruptcy trustee described the fact that both events occurred on the same day as an "incredible coincidence." Cohn's affidavit, however, explains that the date of the issuance of the new certificate was "not purely coincidental." Cohn stated that when he learned that David Russ had filed bankruptcy, having had no prior knowledge of David Russ' decision to do so, he contacted Tim-

---

**2.** We note that Damark stock could not have been acquired on March 1, 1986 because Da-

mark was not incorporated until March 20, 1986.

mer's law office to be certain that the company's books and records reflected Cohn's ownership of the 400 Damark shares he had purchased from Ruwest. Cohn stated that he understood that neither Diane Russ nor Ruwest had filed bankruptcy, but he wanted to make sure there was no issue with respect to the shares. Cohn stated that he spoke with Timmer's law partner, Bill van Vliet. Cohn stated that when he learned that no new certificate had been issued even though the transfer had been completed in April, he requested that a new certificate be prepared that day. Timmer's affidavit reflects that Timmer first learned of David Russ' bankruptcy filing when he received an official notice and proof of claim form from the bankruptcy court. Timmer noted that his law firm had earlier performed services for International Rubber and was listed as a creditor.

Some of David Russ' financial difficulty stemmed from his personal guarantee of several of International Rubber's debts. On his bankruptcy petition, David Russ described his occupation as a sales manager for Damark. He did not indicate that he co-founded Damark, he did not indicate that he was an officer or director of Damark, nor did he list any ownership interest in Damark stock. He did not mention Ruwest or Ruwest's recent transfer of Damark stock to Cohn. In October 1987, David Russ received his Chapter 7 discharge.

David Russ continued to work full-time with Damark throughout 1987. That year, Damark lost $470,000 on sales of $4,852,000. As "an incentive [for David Russ] to use his best efforts to build and develop Damark's business," Cohn agreed to transfer 400 shares of his Damark stock to David Russ as of January 2, 1988. On that date, Damark issued a stock certificate to David Russ for 400 shares of Damark stock "per agreement of 1/2/88." A note from David Russ to his attorney dated January 18, 1988 instructed the attorney to "draw up Stock Agreement Between Mark & I * * * As of 1/1/88." On January 1, 1988, Damark had a negative book value of $369,310. A 1988 U.S. Corporation Income Tax Return prepared by Damark's paid tax preparer represented that

David Russ and Cohn were each officers and each owned 24.5% of Damark's stock.

In July 1988, the bankruptcy trustee received a copy of David and Diane Russ' 1987 joint individual tax return, which return indicated that on April 30, 1987 there was a sale of Damark stock with a basis of $1,900 for $1,000. The return was added to the trustee's file. While the trustee had no specific recollection of reviewing the return, he later stated that if he had looked at Schedule D, he would have assumed the Damark stock was David Russ' because such an assumption would greater benefit the bankruptcy estate. He stated that he would have seen a loss on the sale, and that the sale date was prior to the filing. He stated that the sum involved was not a large enough sum for him to try to create a "preferential action" because it would cost more to recover the stock than the stock was worth.

In September 1988, the bankruptcy trustee filed his final report and account regarding the David Russ bankruptcy estate with the United States Bankruptcy Court. The report did not mention Damark, Damark stock, or Ruwest. The David Russ bankruptcy case was closed on June 10, 1989.

Between 1988 and 1991, Damark obtained greater financial backing and grew substantially. A 1.925 for 1 stock split of Damark stock occurred on March 30, 1990 and a 2,000 for 1 stock split occurred on August 31, 1990. By March 1991, David Russ had decided to leave Damark for personal reasons. On March 1, 1991, David Russ and Cohn signed a "Stock Option Agreement" granting Cohn the option to purchase up to 1.165 million shares of Damark common stock from David Russ for $5.00 to $7.87 per share. David Russ also signed a "Redemption Agreement" in which Damark agreed to redeem shares of Damark common stock from David Russ for $5.00 per share. David Russ agreed to resign as an officer and director of Damark on May 31, 1991. The record shows that pursuant to these agreements, Cohn exercised his option to purchase some of David Russ' shares in Damark, and Damark did redeem some of David Russ' shares.

David Russ reported sales of Damark stock in his individual income tax returns for

1991 and 1992. Schedule D of David and Diane Russ' 1991 return indicates that the Damark stock sold in 1991 was *owned since 1986.* Schedule D–1 of the Russes' 1992 return reports that Damark stock sold on March 1, 1992 was *acquired on January 1, 1985,* a date *prior* to the company's March 20, 1986 incorporation date. The "certified tax preparer" who prepared these returns later stated by affidavit that he had no reason to believe that either the 1985 date or the 1986 date accurately reflected the acquisition date of the Damark stock that the Russes sold in 1991 and 1992. He stated that he used the 1985 and 1986 dates to demonstrate that the gains from the 1991 and 1992 sales were long-term, rather than short-term, capital gains. He further stated that neither David nor Diane Russ had instructed him that they acquired Damark stock on those dates. He stated that he intended to show that the Damark stock had been held longer than one year when it was sold, and not the actual date, or year, that the stock was acquired.

David Russ' financial statement dated July 15, 1992 indicates that as of that date, he owned 999,545 shares of Damark stock, worth $5,659,179. Cohn and Damark assert that by 1993, Damark had annual revenues of $364 million and a customer list of nearly 8 million. As the result of public offerings on the NASDAQ National Market System, Damark stock is now publicly traded. Cohn stated in his affidavit of March 8, 1994 that at the close of trading on March 7, 1994, the per share trading price of Damark stock was $29 1/4.[3]

The genesis of the lawsuit that is now before this court was when Kevin Lamson encountered David Russ in an unrelated matter. Lamson has an ownership interest in a company known as Merit Acquisition, which is in the business of buying judgments, defaulted bonds, notes, and mortgages. In May 1992, Warren Utz, a business partner of Lamson's, purchased a promissory note executed by Immedia Duplication Services, Inc. (Immedia) at a sheriff's sale in order to create a "windfall situation[ ]." It was a $350,000 promissory note, but Utz paid $600 for it. Lamson eventually became involved in litigation related to the bankruptcy of Immedia, which caused him to undertake "some investigation of the business history and background" of David Russ. Lamson stated that "the hair on the back of my neck stood up when I found out that they were ripping the assets out from underneath Warren Utz' security interest, so I started a fairly simple background research review of Mr. Russ * * *." Lamson learned that Russ owned an interest in Damark and had filed personal bankruptcy in 1987, but that his ownership interest, if any, in Damark had not been administered. Lamson stated that he again saw a business opportunity, so Merit Acquisition sent out offers to all of the bankruptcy claimants in Russ' bankruptcy. Merit Acquisition purchased approximately ten bankruptcy claims against David Russ' bankruptcy estate. The claims had a value of approximately $275,000 or more and were purchased for approximately $15,000. Upon Lamson's application, the bankruptcy court reopened the David Russ bankruptcy case on August 12, 1993.

In January 1994, Lamson formed DLH with Bruce Hendry and Neil Dolinsky for the purpose of purchasing any interest the David Russ bankruptcy estate held in Damark. DLH was incorporated on January 28, 1994. The bankruptcy trustee reviewed the David Russ bankruptcy and then, in a motion for approval of the sale of property of the estate, set forth his conclusion that David Russ had always been the equitable owner of the Damark stock and, as a result, either the bankruptcy estate owned the stock or had a valuable claim for conversion or fraudulent transfer against David Russ and others. Merit Acquisition offered the bankruptcy trustee $100,000 for the bankruptcy estate's interest in Damark and all causes of

---

**3.** In his counterclaim, Cohn alleged that as a result of false and defamatory statements by DLH, the price of Damark stock plummeted. He claimed that prior to the commencement of DLH's action and the publicity related thereto, Damark stock was publicly trading at $30 per share, but decreased to approximately $22 per share "due to the wrongful acts of DLH." On Wednesday, November 6, 1996, the date of oral argument, the per share trading price of Damark stock was $9 7/8.

action related thereto. Knowing that there were $327,310.27 in unsecured claims that were timely filed against the David Russ bankruptcy estate, the bankruptcy trustee submitted a counteroffer to DLH for $350,-000.

After a hearing on March 16, 1994, the bankruptcy court issued an order approving the sale to DLH "as is, where is, with no representations or warranties, all right, title and ownership interest in Damark International, Inc. or its stock which is currently property of the bankruptcy estate," and all of the estate's claims and causes of action against David Russ, Cohn, Ruwest, or Damark "relating to the ownership and/or transfer of stock" in Damark owned by David Russ or Ruwest. The approved sale price was $350,000. At the motion hearing, the court stated:

> I think what the Trustee is saying to the buyer is "whatever I have, and I believe in good faith that I have some claims, I am selling to you." And that's really all that is going on here, and I can't tell you the number of times I've approved that kind of sale where the Trustee is unsure—unable to determine exactly what the interest is or what a litigation might determine. Trustee sells it to whoever wants to buy it, and if DLH was stupid enough to pay $350,-000.00 for it, so be it.

Notably, due to Merit Acquisition's status as bankruptcy claimant of David Russ' bankruptcy estate, Kevin Lamson stated that he believed Merit Acquisition would be paid approximately $200,000 of the $350,000 that DLH paid for the bankruptcy estate's interest in the Damark stock.

On March 17, 1994, DLH served a demand on David Russ, Cohn, and Damark for 1.54 million shares of Damark stock. DLH arrived at this figure by taking the 400 shares that DLH claimed David Russ owned when he filed for bankruptcy, and multiplying that number by the two stock splits. DLH's demand was refused.

On March 25, 1994, DLH filed a verified complaint against David Russ, Cohn, and Damark, seeking a declaratory judgment that on March 16, 1994, DLH became the legal and equitable owner of 1.54 million shares of Damark stock. DLH also sought damages of $46,200,000 for conversion of the stock or, in the alternative, an order directing replevin of the 1.54 million shares in the possession or control of David Russ, Cohn, and Damark. DLH alleged that David Russ had an ownership interest in Damark stock which "had been previously concealed" by Russ when he filed his bankruptcy petition. DLH also alleged that after his bankruptcy filing, David Russ transferred Damark stock to Cohn and Damark, and that both Cohn and Damark had knowledge at the time of these transfers that David Russ was not the rightful owner of the stock. Additionally, DLH sought an order enjoining David Russ, Cohn, and Damark from selling, transferring, or otherwise disposing of the stock or its proceeds.[4]

In response to DLH's action, both David Russ and Cohn counterclaimed for defamation. David Russ, separately, and Cohn and Damark, jointly, also brought motions for summary judgment. David Russ asserted that summary judgment was proper because the only conceivable claim that DLH could bring under the circumstances was a fraudulent transfer claim, which claim DLH did not, and could not, bring. Cohn and Damark argued that the limitations periods on DLH's asserted causes of actions had expired.

After a hearing, the district court granted David Russ' and Cohn and Damark's motions for summary judgment. The court reasoned that DLH could have no greater rights than the bankruptcy trustee. The court then concluded that the bankruptcy trustee had no cause of action for replevin or conversion because David Russ did not own Damark stock prior to filing bankruptcy and because there had been no evidence to demonstrate that David Russ had any right to possess such stock at the time he filed bankruptcy. Therefore, the court concluded, DLH had no

---

4. At that time, DLH also moved for a temporary restraining order enjoining respondents from selling, transferring, or otherwise disposing of the shares formerly owned by David Russ or their proceeds, but the district court denied the motion, concluding that equitable relief was not warranted.

cause of action for replevin or conversion. Rather, the court noted, the only possible cause of action available to either the bankruptcy trustee or possibly DLH would have been a fraudulent transfer action.

The court further held that even if DLH's claims were viable, they were time-barred. The court concluded that a conversion or replevin claim would be barred by the six-year statute of limitations for such actions, and that a fraudulent transfer claim would have been time-barred if brought after the earlier of either the date the bankruptcy case was closed or one year after the fraudulent transfer. The court also held that the limitations periods were not tolled by fraudulent concealment of David Russ' interest in the stock as a matter of law because the bankruptcy trustee either had discovered, or could have discovered with reasonable diligence, the facts constituting the fraud.

On March 2, 1995, DLH filed a motion to amend and/or vacate the district court's order for judgment. The court denied the motion. The court held that even if a factual dispute existed as to whether David Russ was the actual owner of Ruwest's Damark stock, such a dispute would not alter the court's conclusion that the statute of limitations had expired on DLH's claims. The court concluded that the statute of limitations on DLH's conversion claim began to run when David Russ filed bankruptcy on July 10, 1987 because an action for conversion could have been commenced at that time. The court reasoned that if it were to hold that the limitation period began when DLH gained standing, "[a]nyone could resurrect a dead cause of action merely by selling their time barred lawsuit to a third party." The court also held that due to the lack of evidence that the fraud was concealed, the fraudulent concealment issue could be decided as a matter of law. The court stated that DLH's arguments merely showed either that the fraud was not concealed and the bankruptcy trustee lacked due diligence in discovering the fraud, or that the bankruptcy trustee had discovered the fraud and decided not to pursue the matter.

DLH appealed to the court of appeals, and a divided panel affirmed. *DLH, Inc. v. Russ,* 544 N.W.2d 326, 331 (Minn.App.1996). The court of appeals determined that even if David Russ was the actual owner of Ruwest's Damark stock, DLH had no basis for a conversion claim because the record showed that the stock was sold before David Russ filed bankruptcy. *Id.* at 329. The court held that an actionable conversion did not occur when David Russ sold the stock prior to bankruptcy because the bankruptcy trustee inherited David Russ' property rights when he filed bankruptcy, and David Russ did not possess a cause of action for conversion against himself to pass to the trustee. *Id.* at 330. The court noted that the bankruptcy trustee could have brought a fraudulent transfer action, but that this action was not assignable to DLH, and, in any event, DLH did not plead fraud in its complaint. *Id.* The court also concluded that DLH did not inherit a claim to turn over the assets of the bankruptcy estate under 11 U.S.C. § 542(a) (1982) because the Damark stock never became part of the bankruptcy estate. *DLH,* 544 N.W.2d at 330. Finally, the court held that the statute of limitations issues were moot because DLH had no valid conversion claim and did not plead fraud. *Id.* at 331.

DLH appealed to this court and raises five grounds for reversal. First, DLH argues that summary judgment on its conversion claim was improper because there is a genuine issue of material fact as to whether David Russ owned Damark stock when he filed bankruptcy. Second, DLH contends that its conversion action is not time-barred because the statute of limitations began to run when its demand for the Damark stock was refused, not when David Russ filed bankruptcy. Third, DLH claims that summary judgment was improper because there are genuine issues of fact regarding whether the limitations period was tolled because David Russ fraudulently concealed his ownership of the Damark stock when he filed bankruptcy. Fourth, DLH argues that the running of the limitations period was tolled as a matter of law during the four-year period after the David Russ bankruptcy case was closed and before it was reopened. Finally, DLH contends that it purchased a "turnover" cause of

ac'.ion from the bankruptcy trustee, which is not barred by any statute of limitations.

## I.

■ The overriding issue in this case is whether the district court erred in entering summary judgment in favor of David Russ, Cohn, and Damark. Rule 56 of the Minnesota Rules of Civil Procedure is designed to implement the stated purpose of the rules—securing a just, speedy, and inexpensive determination of an action—by allowing a court to dispose of an action on the merits if there is no genuine dispute regarding the material facts, and a party is entitled to judgment under the law applicable to such facts. *In re Estate of Bush,* 302 Minn. 188, 211, 224 N.W.2d 489, 503 (1974) (citation omitted). Accordingly, rule 56 provides that summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, submitted "show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. When a motion for summary judgment is made and supported, the nonmoving party must "present specific facts showing that there is a genuine issue for trial." Minn. R. Civ. P. 56.05. If the nonmoving party does not so respond, "summary judgment, if appropriate, shall be entered" against the nonmoving party. *Id.*

Much case law and commentary has focused on defining what constitutes a genuine issue of material fact which presents the need for a trial. In 1986, the United States Supreme Court issued a "trilogy" of opinions interpreting the Federal Rules of Civil Procedure which are instructive on this point, particularly in light of the fact that the relevant language of the state and federal rules is identical. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In *Matsushita,* the Court stated that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. In *Liberty Lobby,* the Court held that there is no genuine factual issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." 477 U.S. at 249, 106 S.Ct. at 2511. The Court held that the district court's inquiry is "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. The Court noted that this standard "mirrors the standard for a directed verdict" under the federal rules; if there can be but one reasonable conclusion as to the verdict, a directed verdict is appropriate, but if reasonable minds could differ as to the import of the evidence, a directed verdict is inappropriate. *Id.* at 250–51, 106 S.Ct. at 2511–12. "[T]he inquiry under each is the same," the Court stated, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

■ We have never explicitly held that the standard for granting summary judgment in Minnesota mirrors the standard for directing a verdict, nor do we feel compelled to do so.[5] We have held, however, that summary judgment is inappropriate when reasonable persons might draw different conclusions from the evidence presented. *Illinois Farmers Ins. Co. v. Tapemark Co.,* 273 N.W.2d 630, 634 (Minn.1978).[6] In *Murphy v.*

---

5. Rule 50.01 of the Minnesota Rules of Civil Procedure provides that at the close of the evidence offered by an opposing party or at the close of all of the evidence, a party may move for a directed verdict. "If the evidence is sufficient to sustain a verdict for the [nonmoving party], the motion shall not be granted." Minn. R. Civ. P. 50.01.

6. *See also City of Willmar v. Short–Elliott–Hendrickson, Inc.,* 475 N.W.2d 73, 77 (Minn.1991) (citing *Wittmer v. Ruegemer,* 419 N.W.2d 493, 497 (Minn.1988)); *Anderson v. Twin City Rapid Transit Co.,* 250 Minn. 167, 186, 84 N.W.2d 593, 605 (Minn.1957).

*Country House, Inc.,* we stated that a "genuine issue" of material fact for trial "must be established by substantial evidence." 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976). We went on to state that what constitutes "substantial evidence" is not defined, "but it has been applied to require evidence sufficient to avoid a directed verdict at trial." *Id.* We concluded that "substantial evidence" "refers to legal sufficiency and not quantum of evidence." *Id.* We pointed out that the function of the district court on a motion for summary judgment is not to weigh the evidence. *Id.* We note that several decisions of the Minnesota Court of Appeals have cited *Murphy* for the proposition that a "genuine issue" must be established by evidence sufficient to avoid a directed verdict at trial.[7]

▮ We recognize the differences between a summary judgment and a directed verdict. A summary judgment motion is usually made before trial and decided on the pleadings, depositions, answers to interrogatories, admissions, affidavits, and documentary evidence, if any, while directed verdict motions are made at trial and decided on all of the evidence that has been admitted in the course of trial. *See Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. at 2511 (quoting *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 2171 n. 11, 76 L.Ed.2d 277 (1983)). At trial, cross-examination is available, the judge has the opportunity to observe witnesses, and documents can be explained. Accordingly, the district court should only grant a directed verdict when the court would be obligated to set aside a contrary verdict by the jury as being manifestly against the entire evidence because reasonable persons could draw only one conclusion from the evidence presented. *Coleman v.*

*Huebener,* 269 Minn. 198, 203, 130 N.W.2d 322, 325 (Minn.1964) (citations omitted).

▮ The district court's function on a motion for summary judgment is not to decide issues of fact, but solely to determine whether genuine factual issues exist. *See Nord v. Herreid,* 305 N.W.2d 337, 339 (Minn. 1981) (citing *Anderson v. Twin City Rapid Transit Co.,* 250 Minn. 167, 186, 84 N.W.2d 593, 605 (1957)). We reiterate that the court must not weigh the evidence on a motion for summary judgment. *See Murphy,* 307 Minn. at 351, 240 N.W.2d at 512; *Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.,* 535 N.W.2d 337, 341 (Minn. 1995). However, when determining whether a genuine issue of material fact for trial exists, the court is not required to ignore its conclusion that a particular piece of evidence may have no probative value, such that reasonable persons could not draw different conclusions from the evidence presented.

With this background, we must consider what evidence a nonmoving party must present in order to demonstrate that there is a genuine issue of material fact which presents the need for a trial. Again, the Supreme Court "trilogy" is instructive. In *Matsushita,* the Court interpreted language in the federal rule paralleling Minn. R. Civ. P. 56.05, and held that the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." 475 U.S. at 586, 106 S.Ct. at 1356. The Court held that the nonmoving party, an antitrust plaintiff, must show that the inference of conspiracy was "reasonable," rather than merely possible, in light of the competing inferences. *Id.* at 588, 106 S.Ct. at 1356. In *Liberty Lobby,* the Court stated that summary judgment may be granted against a nonmoving party whose evidence is "merely

---

7. *See Kobluk v. University of Minn.,* 556 N.W.2d 573, 577–78 (Minn.App.1996); *Peterson v. Colonial Ins. of Cal.,* 493 N.W.2d 152, 154 (Minn. App.1992); *Strauss v. Thorne,* 490 N.W.2d 908, 912 (Minn.App.1992), *pet. for rev. denied* (Minn., Dec. 15, 1992); *see also Carlisle v. City of Minneapolis,* 437 N.W.2d 712, 715 (Minn.App.1989) (citing *Liberty Lobby* for the proposition that the summary judgment standard "mirrors" or "is very close to" the directed verdict standard); *but see Moe v. Springfield Milling Corp.,* 394 N.W.2d 582, 585 (Minn.App.1986), *pet. for rev. denied*

(Minn. Oct. 21, 1986) (holding that evaluations under summary judgment standard and evaluations under directed verdict standard are "not precisely analogous"); *Louwagie v. Witco Chem. Corp.,* 378 N.W.2d 63, 68 (Minn.App.1985) ("Although the standards for summary judgment and directed verdict are similar, undue reliance on directed verdict cases when deciding a summary judgment motion is a mistake, especially when determining whether the evidence is 'substantial.' ").

colorable," or "is not significantly probative." 477 U.S. at 249–50, 106 S.Ct. at 2511. The Court also stated that "the mere existence of a scintilla of evidence in support of the [nonmoving party/]plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party/]plaintiff." *Id.* at 252, 106 S.Ct. at 2512. In *Celotex*, the Court held that when the nonmoving party bears the burden of proof on an element essential to the nonmoving party's case, the nonmoving party must make a showing sufficient to establish that essential element.[8] 477 U.S. at 322–23, 106 S.Ct. at 2552.

Several of this court's holdings are consistent with the language in *Matsushita*, *Anderson*, and *Celotex*. In *Bob Useldinger & Sons, Inc. v. Hangsleben*, our court cited with approval the proposition that a "metaphysical doubt" as to a factual issue will not defeat a summary judgment motion. 505 N.W.2d 323, 328 (Minn.1993). In *Nicollet Restoration, Inc. v. City of St. Paul*, we held that a moving party is entitled to summary judgment when "there are no facts in the record giving rise to a genuine issue for trial as to the existence of an essential element of the nonmoving party's case." 533 N.W.2d 845, 847–48 (Minn.1995) (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552); *see also Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn.1995) (summary judgment mandatory for the defendant when "the record reflects a complete lack of proof on an essential element of the plaintiff's claim").

■■■■ From a reading of our precedents and an understanding of the Supreme Court's analysis in the "trilogy," we conclude that while the Supreme Court uses different language, the import of its analysis is the same—the party resisting summary judgment must do more than rest on mere averments. As a result, we need not specifically adopt the language of the "trilogy." We have a long line of authority by which we have established the standard with regard to how a district court determines if summary judgment is appropriate in a particular case. Accordingly, we hold that there is no genuine issue of material fact for trial when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions.

## II.

■■■■ Having discussed the appropriate standard for summary judgment, we turn to the issue of whether the district court properly granted summary judgment against DLH on its conversion claim. Conversion is an action at law. *Boyum v. Massachusetts Investors Trust*, 215 Minn. 485, 488, 10 N.W.2d 379, 381 (Minn.1943). It is defined as an act of willful interference with personal property, "done without lawful justification by which any person entitled thereto is deprived of use and possession." *Larson v. Archer–Daniels–Midland Co.*, 226 Minn. 315, 317, 32 N.W.2d 649, 650 (1948); *see also Humphreys v. Minnesota Clay Co.*, 94 Minn. 469, 471–72, 103 N.W. 338, 339 (1905). DLH's theory of recovery on the conversion claim is as follows. DLH claims that David Russ owned 400 shares of Damark stock when he filed for bankruptcy on July 10, 1987, and that on that date David Russ' ownership interest automatically passed to the bankruptcy estate. *See* 11 U.S.C. § 541(a) (1982 & Supp.1987); *Drewes v. Schonteich*, 31 F.3d 674, 676 (8th Cir.1994). DLH claims that it subsequently acquired an ownership interest in 400 shares of Damark stock from the bankruptcy trustee. DLH asserts that a conversion occurred when

---

**8.** The "1986 trilogy" has been cited frequently by lower courts, particularly the "reasonable jury" language of *Liberty Lobby*. David F. Herr, et al., Motion Practice § 16.1.2, at 421 (2d ed.1991). However, the courts appear to have

 applied the "substantial evidence by the non-movant" and "reasonable jury" tests gingerly and have found a genuine factual dispute to exist whenever the nonmovant has created a record of controverted fact questions except in a small class of cases where either the veracity of the controverting matter is highly suspect or where the evidence, even where credited, is so weak as to prompt widespread judicial agreement that the nonmovant's support is but an insubstantial scintilla.

*Id.*

David Russ, Cohn, and Damark refused DLH's March 17, 1994 demand for the stock certificates. DLH concedes that if David Russ had no legal or equitable ownership interest in the Damark stock when he filed for bankruptcy on July 10, 1987, then "DLH loses" because the bankruptcy trustee would have had no ownership interest in Damark stock to sell to DLH.

 In support of their motions for summary judgment, David Russ, Cohn, and Damark have submitted evidence that Ruwest transferred its 400 shares of Damark stock to Cohn on April 30, 1987. They have submitted an agreement dated April 30, 1987, signed by Diane Russ as proprietor of Ruwest, transferring Ruwest's 400 shares of Damark stock to Cohn. They have submitted a cancelled Damark stock certificate for 400 shares which is endorsed by Diane Russ. The endorsement purports to transfer the shares represented by the certificate to Cohn and to authorize Damark's corporate attorney, Steven Timmer, to record the transfer on Damark's corporate record books on April 30, 1987. They have submitted an affidavit by Cohn in which he stated that he purchased the 400 shares of Damark stock from Ruwest on April 30, 1987, took possession of the stock certificate, and delivered it to Timmer. They have also submitted Timmer's affidavit in which he stated that the agreement and the endorsed stock certificate were delivered to him within a few days of April 30, 1987 and that he understood he was to record the transfer on the corporate record books and to issue a new stock certificate to Cohn. Under Minnesota law, "[a]ll that is required to effectuate a valid transfer of securities between the parties to the transfer is delivery with the intent to change ownership." *Brener v. Industrial Steel Container Co.*, 303 Minn. 275, 280, 228 N.W.2d 115, 118 (1975); *see also* Minn.Stat. § 336.8–301 (1986) (repealed 1995); Minn.Stat. § 336.8–104(a) (1996). "Delivery" occurs when the purchaser acquires possession of the security certificate. Minn.Stat. § 336.8–313(1)(a) (1986) (repealed 1995); Minn.Stat. § 336.8–301 (1996). The evidence submitted by David Russ, Cohn, and Damark demonstrates that Ruwest delivered 400 shares of Damark stock to Cohn on April 30, 1987 with intent to

change ownership of the stock. David Russ, Cohn, and Damark have amply supported the premise of their motions for summary judgment, which premise is that no Damark stock was owned by David Russ when he filed for bankruptcy on July 10, 1987.

 Pursuant to rule 56.05, DLH now is obligated to present specific facts showing that there is a genuine issue of material fact as to whether David Russ owned the 400 shares of Damark stock when he filed bankruptcy, presenting the need for a trial. DLH has engaged in extensive discovery and has presented voluminous evidence to the court, most of which evidence goes to the issue of whether David Russ was the true owner of Ruwest's 400 shares of Damark stock. For the purposes of this summary judgment motion only, we will take the evidence in a light most favorable to DLH's position and concede that Ruwest, David Russ, and Diane Russ were the same entity. Having made this concession, we must focus on whether there is a genuine issue of material fact as to whether Ruwest/David Russ/Diane Russ as an entity owned Damark stock on July 10, 1987, the date David Russ filed for bankruptcy. Despite all the evidence presented to the court, DLH is only able to point to three pieces of evidence to support its claim that Ruwest/David Russ/Diane Russ owned the Damark stock when David Russ filed for bankruptcy.

 DLH first points to the Damark stock register. DLH claims that the stock register "lists 'Ruwest Company' as the owner of 400 shares of Damark stock as of July 10, 1987." This is a mischaracterization of the contents of the stock register. The stock register provides that on July 10, 1987, a new stock certificate for 400 shares of Damark stock was issued pursuant to a transfer of 400 shares of Damark stock "From Ruwest to Mark A. Cohn per agreement dated 4/30/87." This court has held that the records of a corporation are competent evidence against an alleged stockholder who denies ownership of corporate stock. *Lebens v. Nelson*, 148 Minn. 240, 243, 181 N.W. 350, 351 (1921). We have also stated the rule that when an individual's name appears on the

stock books of a corporation as a stockholder, a prima facie presumption arises that such individual is the owner of the stock. *Holland v. Duluth Iron Min. & Dev. Co.*, 65 Minn. 324, 332, 68 N.W. 50, 52 (1896). But it is equally true that "[i]t is the law of this state that a transfer of stock is good between the parties and that the title passes to the purchaser without the transfer being entered on the corporate books." *In re Declaration of Trust by Bush*, 249 Minn. 36, 47, 81 N.W.2d 615, 622 (1957) (footnote omitted). The Damark stock register does not support DLH's position that Ruwest/David Russ/Diane Russ owned 400 shares of Damark stock on July 10, 1987. Rather, it corroborates the evidence submitted by David Russ, Cohn, and Damark that Ruwest transferred Damark stock to Cohn on April 30, 1987 and that a new certificate for the shares was issued to Cohn on July 10, 1987 pursuant thereto.

Second, DLH points to David and Diane Russ' personal tax return for 1992, which reports a March 1, 1992 sale of Damark stock that was acquired on January 1, 1985. DLH contends that this return is evidence of David Russ' continuous ownership of Damark stock since January 1, 1985. However, this return is not probative as a matter of law on the issue of whether David Russ owned stock when he filed bankruptcy. Damark stock could not have been acquired on January 1, 1985 because Damark was not incorporated until March 20, 1986, well over a year later. It is axiomatic that a business entity has no power to issue securities until it is incorporated. *See* Minn.Stat. § 302A.161, subd. 19 (1996). The affidavit of the Russes' certified tax preparer, in which the tax preparer stated that he erroneously chose January 1, 1985 as the acquisition date of the shares because he wanted to show that the 1992 sale produced long-term capital gains, further supports the conclusion that

reliance on the return as evidence of stock ownership on January 1, 1985 is misplaced.[9]

Third, DLH points to Damark's 1987 corporate tax returns. The Schedule K–1 attached to Damark's 1987 U.S. Income Tax Return for an S Corporation—Form 1120S—indicates that it covers the period between January 1, 1987 and April 30, 1987 and lists David Russ as a 33 1/3% shareholder of Damark. Schedule E of Damark's 1987 U.S. Corporation Income Tax Return indicates that it covers the entire calendar year of 1987 and lists David Russ as a 25% shareholder of Damark. These corporate tax returns are not inconsistent with an April 30, 1987 sale of the Damark stock to Cohn. They merely show that David Russ owned Damark stock at some time in 1987, a fact which is conceded for the purposes of this summary judgment motion. We further note that Schedule E erroneously represents that 25% of the Damark stock was owned by David Russ; in fact, Ruwest/David Russ/Diane Russ' ownership interest was 24.5%.

The evidence cited by DLH in support of its claim is legally insufficient. DLH's evidence is not sufficiently probative to establish the existence of a genuine issue of material fact for trial on the essential elements of DLH's case. *See Murphy*, 307 Minn. at 351, 240 N.W.2d at 512; *Nicollet Restoration*, 533 N.W.2d at 847. Reasonable persons could not draw different conclusions from the evidence presented. *See Illinois Farmers*, 273 N.W.2d at 634. Accordingly, we conclude that DLH has failed to satisfy its burden of presenting specific facts showing that there is a genuine issue of material fact for trial. The pleadings, depositions, answers to interrogatories, admissions on file, affidavits, and documentary evidence submitted show that there is no genuine issue as to any material fact and that David Russ, Cohn, and Damark are entitled to a judgment as a matter of law.

9. We note that on appeal, DLH did not raise the issue of the Russes' 1991 personal tax return, which reports a 1991 sale of Damark stock that was owned since 1986. We note that if DLH had cited both returns, its evidence would have been internally inconsistent as to the acquisition date of the stock. This inconsistency further supports the conclusion that reliance on the Russes' personal tax returns in this context is misplaced.

We also note that the record shows that David Russ acquired Damark stock in January 1988 after his Chapter 7 discharge. David Russ subsequently entered into a Redemption Agreement with Damark and a Stock Option Agreement with Cohn for the purchase of Damark stock. David Russ sold some Damark stock in 1991 and 1992 pursuant to these agreements.

We affirm the summary judgment entered in favor of David Russ, Cohn, and Damark.

■ Having affirmed the summary judgment entered against DLH on its conversion claim, we need not address DLH's arguments regarding the tolling of the limitations period on that claim. In addition, DLH did not raise a "turnover" claim before the district court, and we will not address it for the first time on appeal.[10] *See Morton v. Board of Comm'rs,* 301 Minn. 415, 427, 223 N.W.2d 764, 771 (1974).

We do not condone David Russ' behavior in failing to disclose the extent of his ties with Ruwest or Damark and in failing to report the transfer of Damark stock on his bankruptcy schedules. But the appropriate action in this case would have been for the bankruptcy trustee to bring a fraudulent transfer action against David Russ for transferring his interest, if any, in Damark stock prior to filing bankruptcy. *See* 11 U.S.C. §§ 548(a), 546(a) (1982 & Supp.1987).

Affirmed.

---

**10.** We note that even if we were to reach the merits of the "turnover" claim, we would affirm summary judgment. DLH cites no case for the proposition that a bankruptcy trustee may sell or transfer a "turnover" cause of action under 11 U.S.C. § 542(a). The general rule is that only bankruptcy trustees or debtors in possession may enforce turnover rights. *See* 9A Am.Jur.2d *Bankruptcy* § 1281 (1991 & Supp.1997); *In Matter of Perkins,* 902 F.2d 1254, 1257–58 (7th Cir.1990) (holding that creditors lacked standing to bring a turnover action to recover debtor's funds because "the authority to collect the debtor's assets is vested exclusively in the trustee"). Even if a "turnover" cause of action was transferable, DLH has failed to present specific facts showing that there is a genuine issue for trial as to whether the bankruptcy trustee had a "turnover" cause of action to sell to DLH.