Bruce **ROLLINS**, Appellant,

v.

**CARDINAL STRITCH UNIVERSITY,** Respondent.

No. C4–00–2032.

Court of Appeals of Minnesota.

May 29, 2001.

Gary B. Bodelson, Minneapolis (for appellant).

Corey J. Ayling, Kathleen M. Brennan, McGrann Shea Anderson Carnival Straughn & Lamb, Chartered, Minneapolis (for respondent).

Considered and decided by LANSING, Presiding Judge, SCHUMACHER, Judge, and ANDERSON, Judge.

## OPINION

SCHUMACHER, Judge.

Appellant Bruce Rollins challenges adverse summary judgment, arguing that the district court erred in ruling against his common law and contractual claims for expulsion from respondent Cardinal Stritch University (CSU). We affirm.

## FACTS

CSU is a private institution of post-secondary education, whose College of Business and Management (CBM) provides undergraduate and master's degrees

in business and management. CBM facilitates degree completion for working adults at various locations in Minnesota and Wisconsin. CBM's Region III office is located in Edina, Minnesota.

In January 1999, Rollins enrolled in a two-year Bachelor of Science degree program in business and management in CBM's Region III. One of the features of the degree program is that students are assigned to a specific "cohort group." The students in the cohort group usually progress through the CBM program together towards their degree. The cohort group concept requires ongoing interaction among the students in the cohort group, as well as the development of a collegial and cooperative relationship amongst those students.

On October 27, 1999, Rollins sent an unsolicited e-mail message to a female classmate. The e-mail had an image of "kissing lips" when it was opened and contained a text message, "FOR THE MAN (OR WOMEN) IN YOUR LIFE." The female classmate forwarded the message to a teacher, stating that she did not know Rollins and that she was not sure why he sent her the e-mail. She further stated that Rollins gave her "the creeps" and his off-color remarks in class made her uncomfortable. The teacher then forwarded the message to Dr. Patrick Sheedy, the Assistant Dean for Operations in Region III, and Douglas Gorsuch, an Educational Counselor in Region III, telling them that Rollins had made numerous inappropriate comments in class and requesting that they look into the matter.

Sheedy asked Gorsuch to contact Rollins and set up a meeting. On December 6, 1999, Gorsuch contacted Rollins and asked him to come into the office to discuss some issues. Gorsuch suggested Rollins could meet with him before class on December 7, 1999, but Rollins declined. On December 10, 1999, Rollins came into the office and Sheedy and Gorsuch talked to him about his behavior in and outside of class. Sheedy informed Rollins that Sheedy had received information that indicated that his remarks in class and outside of class made some of his classmates feel uncomfortable. Sheedy told Rollins that he needed to refrain from any offensive behavior or comments. Rollins responded by threatening to sue the school. Sheedy then ended the meeting.

In January 2000, Rollins continued sending unsolicited e-mails to numerous members of the cohort group. On January 7, 2000, Rollins sent the same female classmate an e-mail referencing the complaint about the kissing lips e-mail and stating, "I don't think you would turn me in, but I sure would rest easier hearing it from you." She forwarded the e-mail to a fellow classmate stating, "What would you do if you were me? I got this from Bruce today. HELP!!!".

On January 18, 2000, Rollins forwarded to several female classmates an e-mail exchange with another classmate concerning the complaint about the kissing lips e-mail. On January 21, 2000, one of the female classmates responded to Rollins's January 18 e-mail and requested that he stop sending her unsolicited e-mails, copying the message to several classmates and CBM administrators. Rollins responded by sending an e-mail stating that she was "incorrect when you say you have ask [sic] me not to e-mail you" and inquiring why he was a target of her "vendetta." The classmate forwarded Rollins's response to Sheedy and requested intervention as soon as possible.

On January 31, 2000, Rollins sent the same female classmate an e-mail, without comment, containing news accounts of a recent federal district court decision holding that free speech protected a college

student from criminal charges stemming from an Internet posting about the fantasy kidnapping and torture-murder of a female classmate. On February 1, 2000, the classmate forwarded Rollins's January 31, 2000 e-mail to Sheedy. According to his affidavit, Sheedy was "immediately alarmed that Rollins would send an e-mail to [the classmate] when she had specifically told him that she did not want to receive any unsolicited e-mail messages from him." Sheedy was "even more alarmed that the message Rollins sent to [the classmate] concerned a story about a male college student who had written about the fantasy kidnapping and torture-murder of a female classmate." Sheedy immediately contacted Christine Robinson, CSU's Interim Dean of Students, to discuss what action to take in response to Rollins's conduct. Robinson and Sheedy decided to suspend Rollins from class.

A February 1, 2000 letter from Robinson to Rollins informed him of his immediate suspension pending a formal hearing. The letter stated that over the course of a couple months Rollins had "been engaged in conduct with your fellow students that has been unwelcome, persistent, and in some cases frightening," behavior that may have been in violation of specific provisions of the Student Code of Conduct. A disciplinary hearing was subsequently scheduled for February 8, 2000.

Prior to the hearing, Robinson investigated the matter and interviewed Rollins's classmates regarding his conduct. Based on Robinson's pre-hearing investigation of the situation, she determined that several of Rollins's female classmates felt uncomfortable with him and that Rollins had created a level of fear in some of them. Robinson learned that because of Rollins's behavior, some of the female students were having their husbands drop them off and pick them up from classes, wanted to have the classes moved, were thinking about leaving school, and were asking that Rollins not be in their classes.

On February 8, 2000, Robinson conducted the disciplinary hearing with Rollins. Also present were Rollins's attorney, Student Services Director Christine Keith, Gorsuch, and Sheedy. At the hearing, Robinson told Rollins that CSU was concerned that he had engaged in persistent and unwelcome behavior that caused some of his female classmates to be uncomfortable, wary and concerned about their safety, and that he had disregarded requests or directives to stop such behavior.

Robinson asked Rollins why he had e-mailed the classmate when he received the January 21, 2000 e-mail from her telling him not to e-mail her. Rollins's response was that since she had e-mailed him, he was merely answering her e-mail and that he felt he had to respond to her and the others that she had copied on her e-mail to him.

Robinson then asked Rollins about the e-mail he sent on January 31, 2000, about the news account of the student who had posted a story on the Internet about a fantasy kidnapping and torture-murder of a female classmate. Rollins stated that it was an article from the Internet alluding to a case that said governmental agencies cannot stop people from e-mailing. When Robinson asked Rollins what was his intent in sending this e-mail, Rollins replied that she "can't request me to not send e-mails" and "it was just an informational article."

Robinson asked Rollins if he could do it all over again would he do anything differently. Rollins replied that Robinson was asking him to change himself and that he would do things the same way. Robinson then asked Rollins whether he learned anything from this experience. Rollins replied, "No comment." Robinson told Rol-

lins that she would not permit him to be in the same cohort group anymore since the situation had deteriorated enough to affect the learning atmosphere in that group. Robinson also told Rollins that she would require him not to initiate contact, e-mail or otherwise, with anyone in the cohort group.

Robinson asked Rollins (a) whether he would be willing to not initiate contact, in any way, including e-mail, with any former classmates; (b) whether he would be willing to participate in anger management counseling; (c) whether he would be willing to sign a statement indicating that any further problems on his part would result in his removal from the CBM program; and (d) whether he would be willing to obtain a psychological assessment. To each of these inquiries, Rollins replied that he needed to confer with his attorney.

Robinson then suggested to Rollins and his attorney that they draft a proposal that would include what Rollins would be willing to do to avoid future problems if he was allowed to join a different cohort group. Robinson also asked Rollins to rethink his position about not doing anything differently. Robinson told Rollins that she would have a hard time recommending his placement in another cohort group if she could not be reassured that they all would not be back in a similar meeting at the same time next year. The only issue Robinson felt needed to be resolved after the hearing was for Rollins to submit to her an acceptable proposal to allow placement in a new cohort group.

On February 9, 2000, Rollins's attorney, Gary Bodelson, sent Robinson a letter complaining that the disciplinary proceedings had been "biased, unfair, and unnecessarily confrontational and adversarial." Bodelson proposed mediation take place between Rollins and any alleged complainant who wished to participate and stated that Rollins would agree to not communicate with any student who specifically informed him or the university that they did not wish to communicate with him.

On February 11, 2000, Robinson sent Rollins a letter summarizing the decision arising from the disciplinary hearing. Robinson stated that Rollins was removed from his cohort group effective immediately because he had

> engaged in e-mail contact with an individual classmate after being asked not to, did not comply with the directives of staff members to stop behaviors others experienced as harassing, and said [he] would not change [his] behavior if given another chance.

Robinson further acknowledged receipt of Bodelson's letter proposing mediation but stated mediation would not be appropriate and Rollins could either appeal her decision or submit a proposal for reassignment to another cohort group.

In a letter dated February 24, 2000, Rollins, through his attorney Bodelson, appealed from Robinson's decision to CSU President Schneider. Among other things, the letter complained of a lack of prior notice of the exact charges; and that Bodelson was not allowed to actively participate in, or bring a court reporter to, the disciplinary hearing. The appeal letter stated that the disciplinary process used "was biased, unfair, and unreasonably confrontational and adversarial" and that "no legitimate factual basis has been established which would justify expelling Mr. Rollins." In a February 28, 2000 letter to Rollins, CSU President Schneider upheld the disciplinary decision.

Rollins commenced this action, challenging the student disciplinary proceeding by pleading two counts against CSU. The complaint sought damages for loss of income. CSU moved for summary judg-

ment, which was granted by the district court after a hearing. Judgment was entered and Rollins appeals.

### ISSUE

Did the district court err in granting summary judgment in favor of CSU?

### ANALYSIS

■ On appeal from summary judgment, this court determines whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). This court must view the evidence "in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (citation omitted). No genuine issue of material fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (citation omitted).

1. Count I alleged that CSU's disciplinary actions "were unfair, biased, arbitrary, lacking in due process, and based on the bad faith" of the university. In its summary judgment order, the district court observed that Rollins did not base his due process claim on any state action. *See Ben-Yonatan v. Concordia College Corp.,* 863 F.Supp. 983, 987 (D.Minn.1994) (threshold inquiry is whether colleges' actions constitute state action). On appeal, Rollins asserts that count I was based on a common-law cause of action and that the trial court erroneously analyzed the count as if it were a constitutional claim.

Rollins correctly notes that in *Abbariao v. Hamline Univ. Sch. of Law,* 258 N.W.2d 108, 113 (Minn.1977), the supreme court endorsed a common-law duty on the part of a private university not to expel students in an arbitrary manner. In *Abbar-*

*iao,* an expelled Hamline law student brought a complaint for relief "both at common law and under the due process clause of the Federal Constitution." *Id.* at 110. The district court dismissed the suit for failure to state a claim upon which relief could be granted. *Id.* at 111. The supreme court reversed, ruling that the complaint sufficiently alleged state action so as to render improper dismissal of plaintiff's constitutional claim at that stage in the proceeding. *Id.* at 111–12. Concerning the common law claim, the *Abbariao* court stated:

> Plaintiff alternatively cites a common-law duty on the part of the law school not to expel students in an arbitrary manner. In *Gleason v. University of Minnesota,* 104 Minn. 359, 116 N.W. 650 (1908), we held that a university may not arbitrarily expel a student. A law student had been dropped, per resolution of the executive committee of the Board of Regents, for deficiency in his work and charged with certain insubordinate acts towards the faculty. He alleged that the resolution was adopted, without notice to him and without providing him a hearing, at an ex parte meeting where no evidence was taken, that the action resulted from prejudice and personal feeling toward him, and that he had not violated any university rules. The district court overruled a demurrer to the student's petition for a writ of mandamus ordering his reinstatement, and on appeal by the university, we affirmed. Defendants attempt to distinguish the Gleason decision by suggesting that the university treated Gleason more arbitrarily than Hamline treated plaintiff. The difference goes to satisfaction of the university's duty, not to its existence.
>
> The requirements imposed by the common law on private universities parallel those imposed by the due process

clause on public universities. We need not delineate them here other than to state that academic deficiencies per se are not subject to judicial review. Plaintiff alleged, inter alia, that his expulsion was precipitated by a discriminatory grading procedure. As such, the complaint charges arbitrary conduct to Hamline officials and states a claim for which relief may be granted.

*Abbariao,* 258 N.W.2d at 112–13.

▆▆▆ Following *Abbariao,* we hold that common law imposes a duty on the part of private universities not to expel students in an arbitrary manner. *Cf. Harvey v. Palmer College of Chiropractic,* 363 N.W.2d 443, 444 (Iowa App.1984) (citing *Abbariao* in ruling that "a private university may not expel a student arbitrarily, unreasonably, or in bad faith"). Even though CSU was subject to a common law duty not to expel students in an arbitrary manner, however, the undisputed facts on the record nonetheless support summary judgment. As the district court observed:

> [Rollins] was given notice of the hearing and the reasons for his suspension. He then had the opportunity to explain his actions at the February 8, 2000 disciplinary hearing. Moreover, [Rollins] was given opportunities after the hearing to present a proposal to CSU to allow him to join a new cohort group.

[Rollins's] failure to be reinstated as a student at CSU falls completely on his own shoulders. Robinson made perfectly clear to [Rollins] what he needed to do in order to be reinstated as a student at CSU. [Rollins] failed to do so for his own personal reasons. Irrespective of why [Rollins] failed to submit a proposal regarding his joining a new cohort group, his failure to do so resulted in CSU not reinstating him as a student at CSU. CSU's actions towards [Rollins] establish that CSU was fair with [Rol-

lins]. CSU's offer to allow [Rolllins] to join a new cohort group if he simply presented an acceptable proposal that addressed that issue establishes CSU's good faith toward [Rollins].

After a careful review of the record, we agree that nothing in the record supports the suggestion that CSU treated Rollins in any manner except fairly and in good faith. Because the record taken as a whole could not lead a rational trier of fact to find for Rollins, there is no genuine issue of material fact so as to survive summary judgment. *See DLH, Inc.,* 566 N.W.2d at 69. Accordingly, we affirm summary judgment as to count I.

▆▆▆ 2. Count II alleged that CSU's actions were "a breach of the contractual obligations implicitly or expressly included in [CSU's] Student Handbook." The district court noted that an

> examination of the Student Conduct Code in the Student Handbook reveals that there was no exchange of promises between CSU and its students sufficient to create a contract between [CSU and Rollins].

The district court further stated that

> [e]ven if the CBM Student Handbook is considered a contract between [Rollins] and CSU, none of CSU's actions towards [Rollins] breached any contractual obligations it had with [Rollins].

Minnesota courts are generally reluctant to find contractual obligations between students and their schools based upon student handbooks. In *Abbariao,* the supreme court stated that "[e]lements of the law of contracts have been applied to the student-university relationship, but rigid importation of contractual doctrine has been rejected." 258 N.W.2d at 113; *see also Zellman v. Independent Sch. Dist. No. 2758,* 594 N.W.2d 216, 219 (Minn.App.1999) (student handbook not a unilateral contract),

*review denied* (Minn. July 28, 1999). The *Abbariao* court affirmed the dismissal of the plaintiff's contractual claim, noting that plaintiff's insistence on exact compliance a student bulletin's representations "likely should be regarded as interfering beyond an acceptable degree in [the university's] discretion to manage its affairs." 258 N.W.2d at 114. In *Ross v. University of Minn.*, 439 N.W.2d 28, 34 (Minn.App. 1989), *review denied* (Minn. July 12, 1989), this court stated:

> In *Abbariao* the Minnesota Supreme Court found that the school bulletin did not constitute a contract between the school and the student which required strict compliance with every provision.

Following *Abbariao* and also *Ross,* we hold that the student handbook in this case did not constitute a contract between the school and the student that required strict compliance with every provision.

Regardless, the student conduct code in the CBM student handbook gives CSU the right "to preserve for all of its students an environment that is conducive to academic pursuit, social growth and individual discipline." It provides that students are expected to act responsibly and that CSU reserves the right to discipline those whose conduct is in violation of university standards, listing 17 examples of conduct subject to disciplinary action, including four recited to Rollins in the initial February 1, 2000 suspension letter.

Regarding process, the student conduct code provides that CSU may suspend students pending a formal administrative hearing. A student has a right to assistance at the administration hearing but does not have the right to have an attorney represent him at the hearing. Once the decision from the administrative hearing is made, the student has the right to appeal the decision to CSU's president. The student conduct code provides that the "decision of the President will be final."

We concur with the district court's decision that CSU substantially complied with the student conduct code in this case. Rollins was afforded a hearing and appeal as provided by the student conduct code in the student handbook. Even if the student handbook constituted a contract between the university and Rollins, summary judgment on the contractual claim was appropriate as a matter of law. Because the record taken as a whole could not lead a rational trier of fact to find in Rollins's favor, there is no genuine issue of material fact so as to survive summary judgment. *See DLH, Inc.*, 566 N.W.2d at 69. Accordingly, we affirm summary judgment as to count II.

## DECISION

The district court did not err in granting summary judgment in favor of CSU. Although common law imposes a duty on the part of private universities not to expel students in an arbitrary manner, Rollins presented no evidence of genuine material fact to survive summary judgment. Further, the student handbook did not create a contract between CSU and Rolllins; even if it did, Rollins presented no evidence that any of CSU's actions towards Rollins breached any contractual obligation.

**Affirmed.**