LIBERTY MUTUAL INSURANCE
COMPANY, Respondent,

v.

NORTHEAST CONCRETE
PRODUCTS, LLC, et
al., Appellants,

and

Northeast Concrete Products,
LLC, Appellant,

v.

Liberty Mutual Insurance Company,
Respondent.

No. A07–2134.

Court of Appeals of Minnesota.

Sept. 23, 2008.

Holly J. Newman, Marilyn J. Rosberg, Mackall, Crounse & Moore, PLC, Minneapolis, MN; and Robert G. Watt, C. William Groscup, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., McLean, VA, for respondent.

Kyle E. Hart, Julie A. Doherty, Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, MN, for appellant.

Considered and decided by CONNOLLY, Presiding Judge; WORKE, Judge; and MUEHLBERG, Judge.*

## OPINION

CONNOLLY, Judge.

Appellant argues that summary judgment was improperly granted and $400,000 in escrowed funds was improperly released by the district court. Because the district court did not err in granting summary judgment, nor did it abuse its discretion in releasing the funds, we affirm.

## FACTS

In 2003, M.A. Mortenson Company (Mortenson) and the United States Navy entered into a design/build contract relating to the construction of a parking garage (the project). On September 25, 2003, Mortenson and appellant Northeast Concrete Products, LLC (NECP), entered into a subcontract whereby Mortenson was to pay NECP $4,667,000 to structurally design, fabricate, and erect the precast concrete structure for the project. On December 15, 2003, respondent Liberty Mutual Insurance Company (Liberty) issued the performance bond for the project as the surety, naming NECP as principal and Mortenson as obligee. The performance bond required that, in the event of a breach by NECP, Liberty would remedy the breach and complete the subcontract in accordance with its terms and conditions.

In order to induce Liberty to provide the performance bond, NECP and Liberty entered into a General Agreement of Indemnity in 2001 (indemnity agreement). Under the agreement, NECP agreed to

> exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses, fees, costs and expenses of whatsoever kind or nature including but not limited to ... losses, fees, costs and expenses which the Surety may sustain or incur ... (2) by having executed or procured the execution of any Bond....

On July 14, 2004, Mortenson declared NECP's subcontract in default, terminated the subcontract, and demanded that Liberty complete the subcontract. Liberty sent a letter to NECP demanding indemnification and exoneration from any asserted liability. Liberty also attempted to remedy the situation by convincing Mortenson to rescind the default declaration. Mortenson refused to do so and informed Liberty that, unless it took over NECP's responsibilities under the subcontract, "Mortenson [would] be forced to directly

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

take over performance of NECP's work, and look to Liberty Mutual for reimbursement of costs incurred. The costs of the options available to Mortenson for completion of the work are undoubtedly much higher than those available to Liberty Mutual." Liberty subsequently agreed to take over and complete the project subject to a full reservation of Liberty's and NECP's rights, including the right to contest the validity of the termination. NECP continued to work on the project, however, it relinquished its right to receive any further payments under the subcontract. Specifically, NECP irrevocably requested that Mortenson send "payments due or to become due of any kind or nature" under the subcontract directly to Liberty.

On May 23, 2005, Mortenson filed a demand for arbitration, seeking damages from NECP and Liberty. NECP and Liberty subsequently filed counterclaims, seeking damages relating to the subcontract, including alleged nonpayment of subcontract balances. As of March 10, 2006, Mortenson sought over $290,000 in damages from Liberty. Furthermore, this potential damages claim was subject to upward adjustment because Mortenson claimed that it was entitled to attorney fees. Liberty sought a decision from the arbitration panel as to Mortenson's attorney-fee claim. The arbitration panel ruled against Liberty, such that NECP and Liberty then faced potential exposure not only for Mortenson's direct damages, but also for the entirety of its claimed fees. This meant that NECP and Liberty were facing exposure of nearly $600,000 in damages. Consistent with its rights under the indemnity agreement, Liberty repeatedly de-

manded that NECP defend it and hold it harmless for all losses, fees, and expenses.

With the arbitration hearing set to commence on September 11, 2006, NECP, Liberty, and Mortenson conducted mediation in July. It became clear at that point that a settlement of all claims among all parties would not be possible. Therefore, Liberty commenced discussions with Mortenson concerning a bilateral settlement. NECP was immediately notified of these discussions between Liberty and Mortenson. Nonetheless, Liberty continued to work toward a global settlement but was unable to procure an agreement satisfactory to all parties. Liberty then informed NECP that if no agreement could be reached, Liberty would reserve its right to assign prosecution of its subcontract balance claim as part of any future settlement with Mortenson.

On August 22, 2006, Liberty entered into a settlement agreement with Mortenson. Under the terms of this agreement, Liberty reserved the right to assign to NECP all or part of the residual subcontract-balance claim with this right of assignment expiring on the evening of the first scheduled day of arbitration, September 11, 2006. This subcontract-balance claim was valued at approximately $1.6 million.[1]

Liberty made an initial offer to NECP to assign to it the $1.6 million subcontract-balance claim. This offer contained two terms. First, Liberty sought $185,000 for its actual out-of-pocket losses arising from issuance of the performance bond. Second, Liberty requested that NECP release it from "any and all claims relating to the Project, the Bonds, the General Agreement of Indemnity or the Arbitration."[2]

1. The unpaid subcontract balance was originally determined to be $1,839,358. However, Mortenson agreed to pay Liberty $175,000 in consideration for the settlement. Therefore, the final subcontract unpaid balance was $1,664,358.

2. Liberty had also issued a labor-and-material-payment bond in favor of Mortenson.

This included the claim that Liberty acted in bad faith by taking over the project. In return, Liberty agreed to release NECP for any losses Liberty had suffered to date. NECP did not respond to this offer. On September 1, 2006, Liberty again contacted NECP to "discuss the terms of a potential assignment of its $1.6 [million] subcontract balance claim." Again not receiving a response, Liberty "followed up with a phone call and reaffirmed that [it] was willing to be somewhat flexible relative to its settlement demands." Instead of responding to this settlement offer from Liberty, on September 6, 2006, NECP agreed to accept a $400,000 payment from Mortenson in return for releasing it from all claims arising out of the subcontract and the project. Liberty sought and was granted a temporary restraining order freezing those funds pending further direction from the district court.

On April 18, 2007, the district court granted Liberty's motion for summary judgment on its claims for exoneration and indemnification. On May 24, 2007, the district court granted Liberty's motion to disburse the $400,000 held in escrow to Liberty. On September 14, 2007, the district court granted Liberty's motion for summary judgment on NECP's affirmative claims that Liberty acted in bad faith. This appeal follows.

### ISSUES

I. Did the district court err in concluding that Minnesota law does not require fraudulent intent to prove bad faith by a surety?

II. Did the district court err in concluding that there were no material facts in dispute and therefore summary judgment was proper?

III. Did the district court err by not considering the affidavit of NECP's expert witness when granting summary judgment?

IV. Did the district court abuse its discretion in refusing to continue the summary-judgment motion until NECP could conduct additional discovery?

V. Did the district court err in refusing to allow NECP to compel discovery from Liberty regarding the settlement negotiations?

VI. Did the district court abuse its discretion in releasing the escrow funds?

### ANALYSIS

**I. The district court did not err in concluding that Minnesota law does not require fraudulent intent to prove bad faith by a surety.**

NECP argues that it is not necessary to establish fraud to show that Liberty acted in bad faith. Liberty disagrees, contending that caselaw demonstrates that fraud is required to prove bad faith. The district court determined that Minnesota law does not require a showing of fraud to establish bad faith.

A reviewing court is not bound by and need not give deference to a district court's decision on a purely legal issue. *Modrow v. JP Foodservice, Inc.*, 656 N.W.2d 389, 393 (Minn.2003) (citing *Frost–Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn. 1984)). Therefore, this court will review de novo whether fraudulent intent is required to establish that a surety acted in bad faith.

It is well settled that an indemnitee owes a duty of good faith to its indemnitor. *See New Amsterdam Cas. Co. v. Lundquist*, 293 Minn. 274, 284, 198 N.W.2d 543, 549 (1972) ("We adopt this rule and hold that an indemnitee owes a duty of good

faith to its indemnitor and that any act of the indemnitee which prejudices the rights of the indemnitor will release his obligation to the extent of the prejudice."). It is less clear whether fraudulent intent is necessary to establish bad faith in the surety context.

■ Liberty cites to several cases to support its position that fraud is required to establish bad faith. These cases, however, are either unpublished[3] or do not involve a surety.[4] Furthermore, the seemingly seminal case in Minnesota on the rights of indemnitors in a construction bond case does not appear to equate bad faith with fraud. *See Lundquist*, 293 Minn. at 282–83, 198 N.W.2d at 548 (citing a case that refers to bad faith *or* fraud disjunctively) (emphasis added). Requiring bad faith to rise to the level of fraud before an indemnitor is released from its obligations is a step that should only be taken affirmatively. No Minnesota court has taken that step. Therefore, the district court did not err by concluding that a showing of fraudulent intent is not required to prove that a surety acted in bad faith.

## II. The district court did not err in concluding that there were no material facts in dispute and therefore summary judgment was proper.

On appeal from summary judgment, this court asks (1) whether there are any genuine issues of material fact; and (2) whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law." *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993) (citation omitted). This court views the evidence in the light most favorable to the party against whom judgment was granted. *Id.* No genuine issue of material fact exists when "the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn.1997); *see also Schroeder v. St. Louis County*, 708 N.W.2d 497, 507 (Minn.2006) (stating that "[a] party need not show *substantial evidence* to withstand summary judgment. Instead, summary judgment is inappropriate if the nonmoving party has the burden of proof on an issue and presents *sufficient evidence* to permit reasonable persons to draw different conclusions.").

### A. Takeover

■ NECP asserts that Liberty's takeover of the subcontract was conducted in

3. *Old Republic Surety Co. v. H.E.A.T. Inc.*, 2005 WL 288790, at *3 (Minn.App. Feb.1, 2005) ("A majority of courts considering the issue have concluded that bad faith does not mean negligence, lack of diligence, or bad judgment, but rather implies a conscious doing of wrong because of dishonest purpose or moral obliquity.") (quotation omitted); *N. Prior, L.L.C. v. Outsourcing Solutions, Inc.*, 2003 WL 1961975, at *4 (Minn.App. Apr.29, 2003) (equating "bad faith" with "fraudulent intent"); *Citation Homes, Inc. v. Felton*, 2002 WL 1331745, at *4 (Minn.App. June 18, 2002) ("Bad faith is not easily defined but includes the commission of a malicious, willful wrong and requires fraudulent intent.").

4. *Prichard Bros., Inc. v. Grady Co.*, 436 N.W.2d 460, 466 (Minn.App.1989) ("Bad faith requires a fraudulent intent."), *review denied* (Minn. May 7, 1989). This case dealt with a construction contractor who brought a negligence action against an architect for damages arising out of delays in the completion of a school construction project.

bad faith in an effort to maintain a lucrative business relationship with Mortenson. Liberty contends that it was forced to take over the contract or face significant liability.

The district court determined as a matter of law that Liberty acted in good faith in taking over the subcontract from NECP and provided clear and succinct reasoning for its decision:

On July 14, 2004, Mortenson terminated NECP's subcontract for default and demanded that Liberty complete NECP's obligations under the subcontract in accordance with the performance bond. Liberty subsequently investigated Mortenson's grounds for default termination, then attempted to persuade Mortenson to rescind the default. Mortenson refused to do so on August 5, 2004 and informed Liberty that Mortenson would seek reimbursement from Liberty for the costs of completion if Liberty failed to take over NECP's obligations under the subcontract. Liberty was left with no choice: it could either take over NECP's obligations and later seek indemnification from NECP, or it could default on the performance bond and face substantial liability. Liberty took over NECP's obligations, and in light of the surrounding circumstances, Liberty did not violate its obligations of good faith toward NECP by doing so.

NECP argues that Liberty took over the contract because of a long-standing business relationship between Mortenson and Liberty. There is nothing in the record to support this assertion. In fact, Liberty's senior surety counsel stated in his affidavit that when considering taking over the project "[t]he extent to which Liberty writes bonds or insurance for Mortenson played no role whatsoever in my decision making process. In fact, I did not even learn that Liberty writes insur-

ance for Mortenson until 2007–nearly 2.5 years after the default."

NECP further contends that Liberty did not have to take over the subcontract because NECP was a solvent company which could have indemnified Liberty up to the full amount. The district court heard this argument in the temporary restraining order hearing:

NECP'S COUNSEL: [W]e claim that they wrongfully took over the project.

THE COURT: But they had to take over because Mortenson put a gun at their head.

NECP'S COUNSEL: No, they didn't have to take over. We performed—we were performing the work, we weren't in breach, they didn't have to take over. That was their decision, and one of the reasons they did, we believe, is that they do about a billion dollars worth of insurance with Mortenson, so when Mortenson said "jump" they did.

THE COURT: But would you agree if they hadn't jumped they could have been liable to—Mortenson could have sued them directly for their entire company treasury up to the amount of the loss?

NECP'S COUNSEL: Yes; and then what they would do is under the general agreement of indemnity they could look to the companies who have twenty-five million dollars in assets to hold them harmless. They did not have to do what they did, Your Honor.

THE COURT: And how many years would that take for that to work its way through our wonderful court system, twenty?

NECP'S COUNSEL: It would probably take the same as it's taking for this case, Your Honor.

What NECP fails to note and what the district court correctly understood, howev-

er, is that under its proposed course of action, Liberty might have been looking at millions of dollars in costs and fees, rather than the hundreds of thousands at issue in this case. Liberty needed to protect itself from such an outcome.

Most importantly, however, Liberty executed a bond that required it to complete the remaining work upon a declaration of default. The performance bond explicitly required the surety to remedy the default, take over the subcontract itself, or hire another subcontractor to complete the work. Therefore, this was not a choice, but rather a contractual obligation.

There is no genuine issue of material fact in dispute with regard to Liberty's takeover of the contractual duties as required by the bond. NECP is only able to provide mere speculation that Liberty acted out of a feeling of loyalty to Mortenson rather than contractual duty. Speculation is not enough to defeat a motion for summary judgment, and the motion was properly granted on NECP's bad-faith takeover defense.

### B. Settlement

NECP argues that Liberty acted in bad faith when it settled with Mortenson because Liberty did not communicate its settlement negotiations or ultimate settlement to NECP. Liberty asserts that it kept NECP apprised of the negotiations and therefore did not act in bad faith.

■ As discussed above, an indemnitee can recover under an indemnity agreement only if the indemnitee's actions did not prejudice the indemnitor's rights. *Lundquist*, 293 Minn. at 283–84, 198 N.W.2d at 549. In order to act in good faith during settlement negotiations, the Minnesota Supreme Court has held "that the indemnitee is required to communicate to the indemnitor all offers of settlement which affect the indemnitor's obligation to the indemnitee." *Id.* at 287, 198 N.W.2d at 551.

■ At the July 2006 mediation, it is undisputed that NECP and Mortenson were very far apart in their negotiations. Therefore, Liberty commenced discussions with Mortenson concerning a bilateral agreement. The record indicates that NECP was informed of those initial discussions that same day. Liberty again contacted NECP on August 11, 2006, to discuss the prospects of a settlement between all three parties. Liberty's attorney, C. William Groscup, was informed that NECP and Mortenson remained very far apart, "making a global settlement between all parties all but impossible." Groscup noted that if no deal could be reached between the parties, "Liberty would preserve its right to assign prosecution of its subcontract balance claim as part of any future settlement with Mortenson." Groscup continued to reiterate the advantages of a global settlement in e-mails to NECP. Nonetheless, no settlement involving all parties could be reached, and Liberty and Mortenson entered into a bilateral settlement agreement. The district court summarized these discussions:

> Mr. Groscup's sworn affidavit states that Liberty apprised NECP of ongoing settlement discussions between Liberty and Mortenson and that NECP made no formal objection. The record does not indicate whether NECP was informed of the substance of those discussions or of a final settlement offer before the settlement between Liberty and Mortenson was concluded. However, it does demonstrate that Liberty repeatedly attempted to contact NECP regarding the Liberty/Mortenson settlement agreement prior to its conclusion and that NECP failed to respond to these attempts. Accordingly, NECP cannot

now claim that its lack of information regarding the settlement was due to Liberty's bad faith.

Liberty contacted NECP several times in an effort to encourage global settlement and keep NECP informed of the settlement negotiations between Mortenson and Liberty. Liberty also contacted NECP on the day that a settlement was reached, detailing the specifics of the agreement. This court concludes, as a matter of law, that Liberty's efforts were enough to constitute good faith.

## C. Waiver

■ In Liberty's settlement agreement with Mortenson, the unpaid subcontract balance was stipulated to be $1,839,358. Liberty received $175,000 in unpaid subcontract balance funds from Mortenson. Liberty then subtracted the $175,000 that it had received from Mortenson to reach a figure of $1,664,358. This was the amount that Liberty had the right to assign to NECP. Liberty claims that every dollar ($175,000) that it received from Mortenson was applied directly to NECP's indemnity ledger, thereby reducing the balance.

NECP claims that by entering into a settlement agreement with Mortenson, Liberty waived over $2 million of NECP's arbitral claims. Liberty contends that neither it, nor Mortenson, had any intention of waiving those claims because their settlement agreement only covered the unpaid subcontract balance. The district court determined that Liberty had no intention of waiving NECP's arbitral claims and therefore Liberty acted in good faith when reaching a settlement with Mortenson.

Liberty and Mortenson have both submitted affidavits stating that NECP's arbitral claims against Mortenson were not waived in the settlement agreement between them. Liberty's senior surety counsel states:

> I was directly involved in the Mortenson/Liberty settlement. Consistent with Mr. Funk's affidavit, at no time did Liberty settle (or intend to settle) any of NECP's arbitral claims. Quite to the contrary, I insisted that any of NECP's arbitral claims (whether asserted directly or indirectly through Liberty) not be released.

The senior vice president of Mortenson confirmed this statement to be true:

> Had Liberty assigned the Residual Subcontract Balance Claim to NECP, Mortenson expected that (absent a settlement between Mortenson and NECP) NECP would have continued to assert in the arbitration all of the arbitral claims, subject to a $175,000 reduction in the Residual Subcontract Balance reflecting Mortenson's payment to Liberty of $175,000 under the Mortenson/Liberty Settlement Agreement.

Furthermore, the settlement agreement between Mortenson and Liberty does not state that all other claims are waived. Had this been the intention, considering that Mortenson was looking at over $2 million in arbitral claims from NECP, it most certainly would have been contemplated and set forth in the agreement.

NECP argues that a statement in its settlement agreement with Mortenson proves that Mortenson believed that its agreement with Liberty waived all of NECP's claims. This statement says that "whereas, Mortenson contends that if the residual unpaid subcontract balance claim is zero, then NECP has no further monetary claims against Mortenson arising out of the project." This statement could simply imply that Mortenson believed that the arbitral claims were without merit. Furthermore, if Mortenson truly thought that all arbitral claims had been waived, it

would not have paid $400,000 to NECP and required a release from all further claims relating to the subcontract and the project.

The four corners of the settlement agreement between Mortenson and Liberty, as well as the affidavits from those parties, convince us that there are no material facts in dispute and that neither Liberty nor Mortenson intended to waive NECP's arbitral claims.

### D. Blackmail

■ NECP argues that Liberty attempted to blackmail it in its assignment of the unpaid subcontract balance. Liberty asserts that it was merely attempting to negotiate the best possible deal and was in no way trying to blackmail NECP. The district court concluded that Liberty did not act in bad faith through these attempted negotiations.

Within hours of its settlement with Mortenson, Liberty proposed an offer to NECP. First, Liberty sought $185,000 from NECP to cover its actual out-of-pocket losses arising from its issuance of the bonds. Second, Liberty requested that NECP release it from the claim that Liberty's post-default decision to complete the project was made in bad faith. In exchange, Liberty agreed that it would release NECP for any losses suffered by Liberty to date and assign the $1.6 million subcontract balance claim to NECP.

NECP did not respond to this proposal. Liberty again contacted NECP to "discuss the terms of a potential assignment of its $1.6 subcontract balance claim." Not receiving a response, Liberty "followed up with a phone call and reaffirmed that [it] was willing to be somewhat flexible relative to its settlement demands." Instead of responding to this settlement offer from Liberty, on September 6, 2006, NECP agreed to accept a $400,000 payment from

Mortenson in return for releasing it from all claims arising out of the subcontract and the project. NECP claims that it was forced to enter into a settlement agreement with Mortenson before September 11, 2006, when the unpaid subcontract balance would be zero.

There are no material facts in dispute. Liberty attempted to garner a settlement through negotiations. This is not blackmail. *See Black's Law Dictionary* 180 (8th Ed.2004) (defining blackmail as "[a] threatening demand made without justification"). There is no way to determine what kind of agreement would have been reached had NECP returned Liberty's repeated requests for a settlement negotiation. NECP is correct in its assertion that it was not required to make a deal with Liberty. But it cannot now claim that it was blackmailed when there are no facts to support this contention. The district court did not err in granting summary judgment because nothing in the record indicates that Liberty acted in bad faith.

### III. The district court did not err by failing to consider the affidavit of NECP's expert witness when granting summary judgment.

NECP argues that the district court erred by not mentioning the expert-witness affidavit it submitted in opposition to Liberty's motion for summary judgment. NECP contends that its expert witness, Brian Downey, explained what acts by a surety do and do not constitute good faith, and therefore raised genuine issues of material fact. Liberty asserts that the expert would only have been able to provide opinions, not raise genuine issues of material fact. The district court was silent as to this evidence when issuing its order for summary judgment.

■ The district court did not make an evidentiary ruling with regard to the admissibility of this expert testimony. Therefore, a de novo determination of whether the expert testimony raised a genuine issue of material fact is applied rather than an abuse-of-discretion analysis regarding the admissibility of the evidence. *See Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 535 N.W.2d 337, 341 (Minn.1995) ("We conclude that the district court did not make an evidentiary determination....Therefore, we review de novo.").

NECP's expert opined in relevant part:

5. Whether a surety is deemed to have acted improperly, wrongfully, unfairly and/or in bad faith is an inherently factual inquiry, dependant on the totality of the circumstances. However, in my expert opinion, it is objectively improper, wrongful, unfair and in bad faith for a surety to engage in any and/or all of the following conduct:

a. Settling claims with regard to a principal's work on a project where a significant motive of the surety in settling is to further the surety's business relationship with the obligee, rather than based on the merits of the claims settled.

b. Settling claims by and against an obligee with regard to a principal's work on a project without informing the principal of its intent to do so, without informing the principal of the proposed settlement terms in advance of the settlement, and without seeking to obtain the principal's consent to the settlement.

c. Threatening and/or following through on a threat to a principal that, unless it agreed to pay the surety disputed amounts allegedly owed the surety by the principal under a General Agreement of Indemnity and give the surety a release of all claims the princi-

pal had against the surety arising out of the principal's work on a project, including claims for bad faith, then the surety would waive claims against the obligee for contract funds with regard to the principal's work on the project.

d. Offering to allow a principal to pursue a claim against an obligee for contract funds with regard to the principal's work on a project, but only if the principal would release the surety from all claims that the principal had against the surety arising out of the principal's work on a project, including claims for bad faith.

6. I have reviewed the payment and performance bonds issued by Liberty Mutual Insurance Company ("Liberty") to Northeast Concrete Products, LLC ("NECP") with regard to the project at issue in this matter, as well as the General Agreement of Indemnity signed by the indemnitors involved in this matter. These documents include the terms, conditions and agreements that I would expect to find in similar documents utilized by sureties throughout the United States. Nothing in the documents would change the opinions I expressed above in paragraph 5.

7. For me to render an opinion on whether Liberty engaged in improper conduct in this case, I would need more time to study the facts and documents, including the relevant project files and correspondence, the pleadings, discovery responses, deposition transcripts and records involving the underlying arbitration, as well as review discovery conducted in this case with regard to the negotiation of the settlement agreement between Liberty and M.A. Mortenson Company.

■ Based on this affidavit, we conclude that NECP's expert witness did not raise any genuine issues of material fact.

Downey provided mere speculation that a company in Liberty's general position *might* have acted in bad faith depending on the exact circumstances. Liberty summarizes this point succinctly: "Mr. Downey's ... opinions cannot possibly raise a genuine issue of material fact because there is no dispute as to any of the facts, only NECP's 'interpretation' of those facts." Such an amorphous argument without specific factual disputes cannot defeat summary judgment. *See Potter v. Pohlad*, 560 N.W.2d 389, 395 (Minn.App. 1997) (holding that conclusory statements of an expert cannot sustain a claim).

NECP's expert witness only provided speculation. He did not raise a genuine issue of material fact, and therefore the district court did not err by granting summary judgment in spite of this affidavit.

**IV. The district court did not abuse its discretion in refusing to continue the summary judgment motion until NECP could conduct additional discovery.**

NECP argues that the district court abused its discretion by not allowing more time for discovery. Liberty asserts that NECP had ample time to conduct discovery but failed to utilize its opportunities.

▇▇▇▇ NECP made no formal motion for a continuance in the district court, but it did request that it be given additional time for discovery. "The decision to grant a continuance is vested in the sound discretion of the trial court." *State v. Miller*, 488 N.W.2d 235, 239 (Minn.1992) (citing *State v. Lloyd*, 345 N.W.2d 240, 247 (Minn. 1984)). "The trial court will not be reversed unless it has abused its discretion." *Id.* (citing *State v. Turnipseed*, 297 N.W.2d 308, 311 (Minn.1980)). "[C]ontinuances should be liberally granted, especially when the continuance is sought because of

a claim of insufficient time to conduct discovery." *Lewis v. St. Cloud State Univ.*, 693 N.W.2d 466, 473 (Minn.App.2005).

▇▇▇▇ This court generally focuses on two questions when determining whether a continuance should have been granted: "(1) Has [appellant] been diligent in obtaining or seeking discovery prior to its [motion for continuance]? and (2) Is [appellant] seeking further discovery in the good faith belief that material facts will be uncovered, or is she merely engaging in a 'fishing expedition?'" *Rice v. Perl*, 320 N.W.2d 407, 412 (Minn.1982).

*A. NECP was not diligent in obtaining or seeking discovery prior to its motion for continuance*

▇▇▇▇ NECP and Liberty filed their separate claims for relief in September 2006. These cases were consolidated on October 12, 2006. NECP made its first request for discovery on January 8, 2007. Liberty responded on February 9, 2007. Liberty brought its first motion for summary judgment on January 31, 2007 and the summary-judgment hearing was held on February 28, 2007. Therefore, the time between filing of the action and the first summary-judgment hearing was nearly six months.

▇▇▇▇ NECP provides no reason as to why depositions were not taken during this period. Liberty argues that "NECP had ample time in the six months between when the case commenced until the hearing on the initial motion for summary judgment to conduct whatever discovery it believed it needed but simply failed to diligently pursue the discovery that it now claims it needed."[5] We agree. *See Dunham v. Roer*, 708 N.W.2d 552, 573 (Minn. App.2006) (holding that the district court did not abuse its discretion by denying

5. NECP asserts that Liberty cannot make this argument for the first time on appeal, because

the district court did not have an opportunity to consider this argument. We disagree.

continuance when appellant had ten months to complete discovery); *Cargill Inc. v. Jorgenson Farms,* 719 N.W.2d 226, 231–32 (Minn.App.2006) (holding that a continuance is not warranted when a party had approximately seven months to conduct discovery). NECP only made one discovery request, to which Liberty responded, and there is nothing in the record to indicate that it attempted to schedule depositions. The district court did not abuse its discretion by not permitting more time for discovery.

> *B. NECP was not seeking further discovery in the good-faith belief that material facts would be uncovered*

■ NECP argues that it had every belief that it would uncover material facts tending to support its arguments through discovery. Liberty contends that NECP was attempting to engage in a fishing expedition and argues that NECP failed to depose anyone prior to the summary-judgment hearing because it was aware that no information existed to support its case.

NECP's arguments are based on speculation. As discussed above, there are no material facts in dispute and basically no evidence detailing what NECP expected to find if it had more time to conduct discovery. NECP only expresses its belief that some evidence exists to demonstrate that Liberty acted in bad faith.

> *V. The district court did not err in refusing to allow NECP to compel discovery from Liberty regarding the settlement negotiations.*

NECP argues that the district court should have compelled Liberty to describe all communications that it had "during the course of the settlement negotiations with Mortenson that specifically related to the claims made by NECP in the Arbitration, including but not limited to all communications involving the stipulated subcontract balance." Liberty asserts that such communications are privileged under rule 114.08(b) of the Minnesota Rules of General Practice.

The district court never addressed this argument because NECP did not bring a motion to compel. Instead, the district court refused to allow the continuance and granted summary judgment. As discussed above, this was not an abuse of discretion. Therefore, it is unnecessary to consider whether this information was actually privileged under rule 114.08(b). *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (holding that an appellate court will only consider matters properly presented to, and considered by, the district court).

> *VI. The district court did not abuse its discretion in releasing the escrow funds.*

Finally, NECP argues that the district court erred in releasing the $400,000 in escrow to Liberty because there was no evidence that it had sustained a real or substantial injury. Liberty asserts that it was entitled to any money arising from the subcontract under its indemnity-and-exoneration agreement. Furthermore, Liberty asserts that it had damages of $185,000 as well as substantial legal fees totaling well over the escrowed amount. Thus, accord-

---

This court generally does not consider arguments on appeal that were not made in the district court. But in this situation, this court automatically looks to NECP's diligence in pursuing discovery, regardless of whether or not it was argued to, or considered by, the district court. *See Rice,* 320 N.W.2d at 412 (concluding that a reviewing court looks to diligence and motive when determining whether a continuance should have been allowed).

ing to Liberty, the escrowed funds were properly distributed.

 The release of funds deposited with the court is considered equitable relief. *See Fritz v. Warthen,* 298 Minn. 54, 61, 213 N.W.2d 339, 343 (1973) (observing that a district court has inherent power to release funds paid into court). "This court will not disturb a trial court's grant of equitable relief unless it finds the trial court abused its discretion." *Bolander v. Bolander,* 703 N.W.2d 529, 552 (Minn.App. 2005).

The district court determined that Liberty did not act in bad faith and granted summary judgment on its indemnification and exoneration claims. Thereafter, Liberty brought a motion to release the escrowed funds. On May 24, 2007, the district court granted that motion.

 Liberty issued a performance bond on NECP's behalf. In return for that bond, NECP agreed to exonerate and indemnify Liberty from any and all losses, fees, costs and expenses. Likewise, in the event of any breach by NECP, all of NECP's "rights, title and interest ... in and growing in any manner out of" the subcontract were assigned to Liberty. Therefore, when NECP defaulted on its contract with Mortenson and Liberty took over that contract, it was entitled to all payments under that subcontract. The district court stated that:

> The $400,000 payment likely arose out of the underlying subcontract. The subcontract is the only agreement that has ever existed between Mortenson and NECP and the arbitration (which was avoided by the settlement) related to Mortenson and NECP's competing claims arising under that subcontract. In fact, without that subcontract, Mortenson would have no reason to pay NECP anything.

Because Liberty acted in good faith when taking over the subcontract, it was entitled to all payments under it. The district court determined that the $400,000 should be awarded to satisfy Liberty's indemnity claim, as well as corresponding legal expenses. The release of these escrowed funds was not an abuse of discretion.

### DECISION

Minnesota law does not require a showing of fraudulent intent to prove that a surety acted in bad faith relating to its obligations concerning the issuance of a performance bond in a construction project. Nonetheless, there is no evidence in the record creating a material fact question on the issue of whether Liberty acted in bad faith, and therefore the district court's grant of summary judgment was proper. Furthermore, the district court did not abuse its discretion by releasing the $400,000 in escrowed funds to Liberty.

***Affirmed.***