*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0780**

Dennis Szymialis,
Appellant,

vs.

James Kuronen, et al.
Respondents.

**Filed January 17, 2017
Affirmed
Connolly, Judge**

St. Louis County District Court
File No. 69DU-CV-15-1744

Dennis Szymialis, Duluth, Minnesota (pro se appellant)

Steven P. Pope, Eden Prairie, Minnesota (for respondents)

Considered and decided by Bjorkman, Presiding Judge; Connolly, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CONNOLLY**, Judge

Appellant, pro se, challenges the grant of summary judgment dismissing his claims arising out of personal injuries he sustained when a dog allegedly belonging to respondents

caused him to fall. Because we agree with the district court that appellant cannot meet the threshold requirement of showing that respondents owned the dog, we affirm.

**FACTS**

In September 2008, appellant Dennis Szymialis was in the backyard of the house of his friends, D.A. and her daughter, L.A., with their two dogs. Respondents James and Amy Kuronen lived nearby. A dog allegedly belonging to them entered the backyard where appellant was and caused appellant to trip, injuring his wrist. Other than having D.A., a retired nurse, wrap his wrist, appellant received no medical attention.

Respondents did not learn of this incident until July 2015, when they were served with a summons and complaint from appellant seeking damages under Minn. Stat. § 347.22 (2016) ("If a dog, without provocation, attacks or injures any person who is acting peaceably in any place where the person may lawfully be, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained.") and under a common-law-negligence theory. Both theories of recovery have as a threshold requirement that the plaintiff prove that the defendant(s) owned the dog that caused the injury.

Following discovery including depositions, respondents moved for summary judgment dismissing appellant's claims. After a hearing, the district court issued an order granting respondents' motion and dismissing appellant's claims on the grounds that appellant's allegations about the involvement of respondents or their dog did "not rise above the speculative level" and that there was "insufficient proof that a dog owned, harbored, or kept by [respondents] attacked or injured [appellant]."

2

Appellant challenges the summary judgment, arguing that he provided sufficient proof that he was injured by respondents' dog in 2008.

## DECISION

This court reviews a grant of summary judgment de novo, determining whether any genuine issue of material fact precludes the judgment and whether the district court properly applied the law. *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010). "[W]hen the nonmoving party bears the burden of proof on an element essential to the nonmoving party's case, the nonmoving party must make a showing sufficient to establish that essential element." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997). A district court "is not required to ignore its conclusion that a particular piece of evidence may have no probative value." *Id.* at 70. Allegations based on speculation are insufficient to create a jury question. *Harvet v. Unity Med. Ctr., Inc.*, 428 N.W.2d 574, 579 (Minn. App. 1988).

The record supports the district court's conclusion that "the dog involved in the incident is not definitively identified as belonging to [respondents]." Appellant testified that, when he fell over the dog, "at that instant, I didn't know for sure whose dog that was, so I yelled at [L.A.'s dog] to go get the [other] dog" and L.A.'s dog "went running after the [other] dog." He also testified that L.A. "came running out of the garage chasing after [her dog] and followed him to [respondents'] house where she retrieved [her dog.]"

Appellant also testified that, about a year later, when he and L.A. drove by respondents' alley, L.A. told him "that was the dog that tripped [him] in [her] back yard" and she "wanted to make sure that [he] knew what dog it was that was the problem."

3

Appellant was asked two questions about the period before L.A. identified the dog to him a year after the incident. When he was asked if he knew then that it was the dog that had caused him to fall, he replied, "You know, I can't specifically recall. But I—I think . . . I'd seen the dog in their back yard before. At the time of the incident, I didn't have specific recall of the dog. But I'd seen it in their yard before and after on my own." When asked if he knew then where the dog lived, appellant answered: "If you had shown me a picture of the dog and said, '[D]o you know where this dog lives?' I would have been able to tell you that it was [respondents'] dog; except at the time of the incident, I didn't have specific recall of that." Appellant first testified he was not sure if L.A. actually saw him fall, then testified that he did not believe she actually saw him fall; he also testified that he was lying down on the lawn when L.A. went to retrieve her dog from respondents' house.

Appellant also testified about his only attempt to contact respondents. He said that, later in the week of the incident, he attempted to contact them by knocking on their door for five or ten minutes, but made no other attempts to contact them between the incident in September 2008 and beginning this lawsuit in July 2015. He further testified, "When I went down the alley initially to go knock on their door, front door, I saw one of their dogs and I don't recall if it was –I think it was their other dog and not the dog that tripped me [that] was outside on the chain." When asked, "[W]hen [L.A.] was chasing [her dog], did she actually observe the other dog?" he answered, "I believe she did when she got . . . closer to [respondents'] house. I'm sure she – I know she observed it when she got closer to [respondents'] house. I'm not sure if she specifically observed it when it – when it tripped me or not." He was questioned further:

4

> Q. So on the day of the incident, did [L.A.] see the other dog go to [respondents'] house?
>
> A. That is correct.
>
> Q. Did she see – did she see how it gained access back to their property?
>
> A. I didn't – I didn't ask her about that.

Thus, appellant relied entirely on L.A.'s acts and testimony to establish a line between the dog he tripped over and respondents' dog.

But L.A.'s testimony does not support appellant's version of what happened. She testified that she had read appellant's deposition testimony before her own deposition, and her testimony reflects that she was not sure what she remembered from reading his deposition and what she remembered from the event itself.

> Q. This lawsuit is about an incident that allegedly occurred in 2008 around Labor Day. Can you tell me everything you remember about the incident?
>
> A. Well, I didn't remember it happened in 2008 and I didn't remember it was Labor Day. But I did read [appellant's] deposition and that's what it says in that deposition. And so I didn't remember much, because it was apparently seven years ago.
>
> Q. . . . [A]re you able to parse out what you remember[ed] about that incident before reading the transcript [of appellant's deposition] and what you remember after reading the transcript?
>
> A. You know, not exactly. . . . I would say I'm not able to parse out some of it.
>
> Q. [W]hat do you remember about the incident underlying this lawsuit?
>
> A. The first thing I noticed is I [didn't] even remember [respondents'] names until I heard their names. I basically knew them through their dog. And it was years ago, and basically [I] had very little interaction with them. Usually it was just the fact that their dog was running loose and I was returning their dog.
>
> . . . .

Q. Do you remember [appellant] being injured on your property in the past, in 2008, whenever it happened?

A. I remember [appellant] saying . . . that he was injured. I didn't see him being injured. I remember him being in the backyard. I remember him saying he was injured.

Q. When did he tell you he was injured, was it the same day as the alleged incident?

A. Yeah, I believe it was.

Q. Can you tell me everything you can remember around that statement?

A. I just remember – I thought – now I'm getting his deposition, it's like is that what happened?

Q. Is it fair to say you don't remember this incident?

A. I don't remember a lot of it. . . . I didn't really understand what happened because I didn't see it.

. . . .

Q. After [appellant] told you he was injured . . . [d]id he tell you about another dog [other than your dogs] being in the yard when he told you he was injured?

A. I think he did. I think he said there was another dog and it ran off or –it gets kind of fuzzy here just because . . .

Q. So when you think he said that, are you a hundred percent positive or are you uncertain?

A. That he said there was another dog?

Q. Correct.

A. Well, I'm not sure what I'm a hundred percent positive of, but I believe he said there was another dog.

Q. At any point did you try and investigate and find the other dog on that day?

A. You know, you can see the neighbor's house from my mom's backyard, and I don't really remember. I read [appellant's] deposition. I don't remember lots of it, but, you know, I think he believed it was the neighbor's dog and I think we believed it was that dog, the dog that normally ran loose.

Q. Are you able to tell me today what neighbor had the dog that was normally running loose, like where were they in proximity to your backyard?

A. They weren't across the alley, they were kind of the next house over through the alley.

. . . .

6

Q.    On that day when [appellant] injured his arm, did you actually see any other dog in the area after he injured his arm?

A.    You know, I'm not sure. Like I said, I haven't thought about this for a very long time and at this point I'm not sure.

Q.    I'm not trying to pick on you, I'm just trying to make sure I understand. At this point you can't say whether – you don't remember whether you saw the other dog that [appellant] spoke about on the day of the accident?

A.    I would have liked to have read the case, the pleadings just as a – my understanding is [respondents] filed something in rebuttal and [appellant] filed something, his case. I believe at the time we believed that it was [respondents'] dog. I don't remember where the dog ran – you know. We believed it was [respondents'] dog. . . .

Q.    What did you base that belief on?

A.    I don't really remember if I saw its hind end running out of the yard or close to their yard or, you know, just the fact that it routinely ran loose.

Q.    So you don't remember specifically any of the things you just listed?

A.    What things that I just listed?

Q.    As you sit here today, can you tell me that you remember seeing a dog run to [respondents'] yard after [appellant's] injury? Because earlier it sounded like you were unsure of that.

A.    That's what we believed at the time, I remember that. You're asking me seven years after the fact if I can swear to something that I haven't been asked about for seven years. And I haven't had the opportunity to look at anything that was filed other than [appellant's] deposition, which I had a very short period of time to look at.

Q.    Would it surprise you to learn that [respondents] never filed anything against [appellant], but this lawsuit arose when [appellant] filed a lawsuit against [respondents] for this incident?

A.    That wouldn't surprise me.

Q.    Did you ever have a discussion after the incident involving the dog with [respondents]? Did you talk to

7

[respondents] and say, hey, I think your dog injured my friend [appellant]?

A. I don't think I did.

Q. Did you do any sort of follow-up investigation, like did you ask other neighbors if they had seen a dog running loose on that day of the incident or anything like that?

A. No, I don't think there was any neighbors around. I rarely saw [respondents].

Q. And you said that – it sounded like [respondents] had had a dog and it got loose on a prior or subsequent occasion. Can you describe that dog?

A. It was – I don't know if it was a golden retriever or a yellow lab mix. I think it was a female, yellow, tan, gold. I don't remember its name. It had a tag, that's how I knew where it lived. We would return it, I mean once we learned what dog it was we would return it. I don't remember its name. I thought it was Lily or Layla or a name like that.

Q. When you returned the dog to [respondents], do you remember having any discussions with [them] about the dog getting out?

A. I did.

Q. Were they friendly conversations, like neighborly, or were you kind of upset about it?

A. I just said that I was worried their dog was going to get hit by a car and that it was going to cause an accident. Or it was running through the neighborhood and you could hear the dogs barking throughout the neighborhood when it would run loose. They said it was getting out under the fence or over the fence. It happened a lot. Finally it – usually it was the husband that would – I don't remember ever actually talking to the wife, who I don't even remember seeing. She must have worked a lot.

. . . .

Q. Now, prior to reviewing the deposition transcript that [appellant] gave you . . . do you remember the last time you thought about this incident?

A. No.

Thus, L.A. did not have any specific recollection of respondents' dog tripping appellant; she remembered only that respondents had a dog who sometimes got loose and

that appellant said a dog had been in the yard and caused him to trip. She had no recollection of going to respondents' house right after the incident or of going there at any other time to discuss the incident. L.A.'s deposition testimony supports the district court's conclusion that "[appellant's] claim that [L.A.] identified the dog as belonging to [respondents] is inadmissible hearsay that cannot be considered on summary judgment." L.A. did no more than speculate that, because respondents were neighbors and their dog sometimes ran loose, it was their dog that caused appellant to trip. Appellant did not present sufficient evidence to create a genuine issue of fact on the threshold requirement that the dog responsible for his injuries was owned by respondents.

**Affirmed.**